[No. F011447. Fifth Dist. Dec. 19, 1990.]

BRANDON & TIBBS et al., Plaintiffs, Cross-defendants and Appellants, v.
GEORGE KEVORKIAN ACCOUNTANCY CORPORATION, Defendant, Cross-complainant and Appellant;
GEORGE KEVORKIAN et al., Defendants and Respondents.

445

**COUNSEL**

Michael A. Milnes for Plaintiffs, Cross-defendants and Appellants.

Donald J. Horvath for Defendant, Cross-complainant and Appellant.

No appearance for Defendants and Respondents.

## OPINION

**MARTIN, J.**—Corporate defendant George Kevorkian Accountancy Corporation appeals from a judgment rendered by the Fresno County Superior Court, Honorable Thomas A. Harris, Judge. The judgment ordered dissolution of a joint venture and awarded to plaintiff Brandon & Tibbs, accountants, a professional corporation, a money judgment on an accounting, damages for breach of contract for lost profits and mitigation expenses less an offset for purchase of the accounting practice, resulting in a net judgment in the sum of $326,803.38.

Brandon & Tibbs, accountants, a professional corporation, and its subsidiary, BATA Leasing Company, cross-appeal from the judgment claiming the trial court failed to include George Kevorkian, the sole shareholder of George Kevorkian Accountancy Corporation, as an individual, and his fictitious business, K Leasing Company, as being liable to plaintiff Brandon & Tibbs for the entire judgment. The cross-appeal also cites error by the trial court by including in the offset to the money judgment for damages for breach of contract a double amount of interest on the purchase price for the accounting business which was subject to the contract in question.

On November 22, 1983, Brandon & Tibbs, accountants, a professional corporation, and BATA Leasing Company, a partnership (plaintiffs), filed a complaint seeking dissolution and accounting of a joint venture between plaintiffs and defendant George Kevorkian Accountancy Corporation, a professional corporation (corporate defendant), and George Kevorkian, individually, and K Leasing Company, a corporation (individual defendants), for monies due and damages for breach of contract.

On December 23, 1983, the corporate defendant and individual defendant George Kevorkian filed an answer to the complaint and the corporate defendant filed a cross-complaint against plaintiff and James Brandon, individually, seeking dissolution and accounting of the joint venture and damages for fraud and breach of contract.

The matter was tried without a jury before the Honorable Thomas A. Harris, Fresno County Superior Court, commencing on June 8, 1987.

On February 18, 1988, the trial court entered its statement of decision giving plaintiff an interlocutory judgment against the corporate defendant upon plaintiff's first cause of action for dissolution of a joint venture and an accounting of the joint venture and judgment against the corporate

defendant upon its second cause of action for breach of contract in the amount of $149,085.38 plus $9,642.50 costs and attorney fees as proved.

The trial court also ruled in its statement of decision that (1) plaintiff would take nothing upon its complaint against George Kevorkian individually or against defendant K Leasing Company and (2) defendant would take nothing upon its cross-complaint against plaintiff and Brandon.

On September 28, 1988, the trial court filed a supplemental order after hearings regarding the accounting issues. The next day the trial court filed an order approving the final accounting submitted by plaintiff. The following day the trial court entered an order upon reconsideration of interest issues to increase the damage award to plaintiff upon its action for breach of contract from $149,085.38 to $326,803.38. This order also amended the February 18, 1988, statement of decision insofar as the statement was inconsistent with the order.

The final judgment awarded plaintiff judgment against the corporate defendant in the sum of $127,194.09 upon the joint venture accounting, $326,803.38 for breach of contract damages, $59,581.30 for attorney fees and $9,642.50 for costs. The total amount of the award was $523,221.27.

On October 4, 1988, plaintiff served notice of entry of judgment by mail. The corporate defendant filed a timely notice of appeal.

## FACTS

### 1. General.

There being little or no discrepancy between the facts as recited by the plaintiff and the defendant, we hereby adopt with appropriate modifications the statement of facts as set forth by the corporate defendant.

In 1981, plaintiff was a professional accounting corporation with offices in Salinas, Monterey, and Watsonville. At that time, plaintiff sought to expand its practice by purchasing an existing accountancy practice in the Fresno area. Historically, plaintiff preferred purchasing existing accounting practices to avoid the expenses of starting up a new accounting practice. New accounting practices generally experience large losses for at least the initial three years while existing practices have the advantage of an existing clientele and usually can grow internally by expanding the accounting products furnished to existing clients.

James Brandon, plaintiff's chief executive officer, handled the negotiations of the acquisition of an accounting practice for plaintiff in the Fresno area. George Kevorkian, at that time corporate defendant's sole shareholder, received a letter of interest from Mr. Brandon and responded by indicating that he was interested in selling his accountancy practice.

The two men negotiated in November and December of 1981. Negotiations were then suspended until February of 1982 when Mr. Brandon presented to Mr. Kevorkian a proposal which had been prepared by an attorney at Mr. Brandon's request. The first proposal outlined a purchase of the corporate defendant for $300,000, a $50,000 deposit and a salary to George Kevorkian for one year at $120,000. Mr. Kevorkian rejected the first proposal and Brandon prepared a second proposal. Neither of these proposals mentioned a joint venture agreement between the parties.

Mr. Kevorkian subsequently arranged to have an attorney, Tim Born, review the second proposal and make various changes in it. Out of concern for the tax liability of his client, Mr. Born suggested that the entity created by the parties be a joint venture; this was discussed and orally agreed to by Brandon and Kevorkian. Several other changes were discussed and incorporated into the final agreement. The buy-out formula was changed to $1.50 per dollar for the first $250,000 of gross revenue in the 12 months preceding the exercise of Mr. Kevorkian's option to sell, which was extended to a 3-year period, and a 75-cent per dollar of gross receipts over that amount.

The initial $50,000 payment, originally characterized as a nonrefundable good faith deposit, was stated to be a one-time consulting fee.

A $10,000 per month payment was to be made to the corporate defendant for management services and equipment leasing. The final agreement, entitled "Management, Joint Venture, and Sales Agreement," was signed by the parties on May 21, 1982.

On or about July 1, 1982, Mr. Brandon and Frank Caprichio, an accountant employed by plaintiff who had moved from Salinas to Fresno, began work for the joint venture. Mr. Kevorkian subsequently caused Caprichio to be terminated in May of 1983.

Other accountants such as Dennis Shirley (in October of 1982) and Paul Bustamante (in February of 1983) moved to Fresno from the Salinas office and began to work in the Fresno joint venture offices during the course of the joint venture agreement. At Mr. Kevorkian's insistence, Mr. Shirley was

terminated in March of 1983. Mr. Bustamante remained with the joint venture until the joint venture terminated.

Over the course of the joint venture's operation, friction and disagreements increased between Mr. Kevorkian and Mr. Brandon. A heated dispute occurred between Mr. Brandon and Mr. Kevorkian which was initiated due to the handling of Mr. Shirley's personal income tax return for a $20 fee after Mr. Shirley had been terminated. During this incident, Mr. Brandon poked Mr. Kevorkian in the chest area with his hand and heatedly told Mr. Kevorkian that he would not tolerate being verbally abused by Mr. Kevorkian.

Mr. Kevorkian ultimately terminated the joint venture, caused Mr. Brandon's phone to be removed from the joint venture office then occupied by Mr. Brandon and demanded that he leave the joint venture offices. Mr. Kevorkian caused the locks on the joint venture offices to be changed without informing Mr. Brandon and ordered joint venture staff to refuse to accept telephone calls or to perform services for Mr. Brandon. Mr. Kevorkian further refused to provide records of the joint venture's operations to plaintiff and refused to divide joint venture profits with plaintiff. Mr. Kevorkian transferred money from joint venture accounts to his own accounts without the consent or knowledge of plaintiff.

The trial court concluded that these acts and the "arbitrary" termination of the employees furnished by plaintiff constituted a breach of the contract.

In November of 1983, plaintiff, acting upon the advice of legal counsel, immediately established a new Fresno branch office by leasing space in the same building in which the former joint venture offices were located. Mr. Brandon, Mr. Bustamante and another nonprofessional staff person worked in the new offices. Mr. Brandon ceased to function as chief executive officer of plaintiff and became the managing partner of the Fresno branch office.

In May or June of 1984, Brandon and his staff moved to larger quarters and the office again expanded to larger quarters 11 or 12 months later.

In its first partial year of operations ending June 30, 1984, plaintiff's Fresno office incurred a net loss of $65,113. In the second fiscal year, it lost an additional $52,112. In the third fiscal year, it lost an additional $37,002. Starting in its fourth year of operations, plaintiff's Fresno branch office commenced earning a profit. The total loss incurred by plaintiff in operating its Fresno office after corporate defendant's breach of the agreement was $154,292, not including any computation of claimed interest.

The Fresno branch office of plaintiff was still in operation at the time of trial.

## 2. The contract.

The contract signed by the parties on May 21, 1982, provided in material part that:

### a. Joint venture and management.

Plaintiff and defendant will form a joint venture known as Brandon, Tibbs & Kevorkian (the joint venture) to operate and develop an accounting practice in Fresno and Madera Counties. The joint venture will last three years, commencing July 1, 1982, and terminate on June 30, 1985, unless terminated earlier by defendant's election to sell its practice to plaintiff.

The joint venture will hire defendant as a consultant; defendant will make Kevorkian available to consult with the joint venture.

Defendant will lease its equipment to the joint venture.

Mr. Kevorkian will be the managing agent of the joint venture. Mr. Brandon, on behalf of plaintiff, will provide "management control and assistance, development of professional staff, and public relations" to the joint venture.

As compensation for defendant's consultation services and the leasing of its equipment, the joint venture will pay the corporate defendant $50,000 on July 1, 1982, $10,000 per month thereafter, and 50 percent of the net profits "after deducting all expenses of the operation of said practice, including the aforesaid sums" of the joint venture. However, if the compensation creates an operating loss "for the period of compensation," the compensation will be reduced dollar for dollar by the amount of the loss.

Plaintiff will receive 50 percent of the joint venture net income and 50 percent of all sums received for billings by Mr. Brandon.

During the existence of the management agreement, plaintiff and defendant will not in any other manner practice accounting in Fresno or Madera Counties.

### b. Purchase and sale agreement.

The purchase and sale agreement provides the corporate defendant with an option to end the joint venture and require plaintiff to purchase its

accounting practice by written notice of its election to do so given at any time prior to June 30, 1985.

Corporate defendant will sell its accounting practice to plaintiff for the greater of (a) $300,000 or (b) 1.5 times the first $250,000 plus .75 times the excess over $250,000 of the joint venture's gross receipts during the 12-month period immediately prior to June 30, 1985, or the corporate defendant's earlier exercise of its option to sell the practice. If the corporate defendant exercises its option to sell prior to July 1, 1983, the formula price based upon gross profits is reduced by $50,000.

The purchase price will be paid in three equal installments over a three-year period with interest at 14 percent per year on the unpaid balance.

In the event of a sale, the corporate defendant and Mr. Kevorkian will not practice accounting in Fresno County for the lesser of five years after the date of the sale or so long as plaintiff practices accounting in Fresno County.

### c. Other provisions.

The contract has an integration clause which provides that the written contract states the entire agreement of the parties. In the event of litigation regarding the contract, the prevailing party is entitled to recover a reasonable sum for attorney fees.

### 3. The trial court's decision regarding damages for the defendant's breach of the sale agremeent.

The final judgment awarded plaintiff judgment against the corporate defendant only for dissolution and accounting of the joint venture and a monetary award of $127,194.09. Plaintiff was further awarded monetary damages against the corporate defendant for breach of the agreement in the sum of $326,803.38 which was computed as follows:

| | |
|---|---|
| "Plaintiffs Lost | |
| "Profits, Damages | $724,807.18 |
| "Plaintiff's Mitigation Damages | $186,729.65 |
| "Total | $911,536.83 |
| "Less: Offset to Defendant for | |
| "Purchase Price Pursuant to | |
| "Terms of Agreement | $584,733.45 |
| "Total Net Judgment | $326,803.38" |

In computing plaintiff's lost profits damages, the trial court relied on the expert testimony of Dillon Gnagy, a certified public accountant. Damages were calculated as of the date of contemplated entry of judgment, September 30, 1988. The court also awarded plaintiffs attorney fees and costs.

### DISCUSSION

### *I. Lost Profits*

Corporate defendant contends the trial court erred in awarding plaintiff damages for lost profits from the corporate defendant's accounting practice because "as a matter of law such damages were not proximately caused by defendant's breach of the contract."

Section 3300 of the Civil Code provides:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, will be likely to result therefrom."

■ The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. (Civ. Code, § 3300; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813, p. 732; 5 Corbin, Contracts (1964) Damages, § 992, p. 5.) The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised. This aim can never be exactly attained yet that is the problem the trial court is required to resolve. (*Ibid.*)

"The rules of law governing the recovery of damages for breach of contract are very flexible. Their application in the infinite number of situations that arise is beyond question variable and uncertain. Even more than in the case of other rules of law, they must be regarded merely as guides to the court, leaving much to the individual feeling of the court created by the special circumstances of the particular case." (5 Corbin, Contracts, *op. cit. supra*, Damages, § 1002, p. 33.)

It is often said that damages must be "foreseeable" to be recoverable for breach of contract. The seminal case announcing this doctrine, still generally accepted as a limitation on damages recoverable for breach of contract, is *Hadley* v. *Baxendale* (1854) 156 Eng.Rep. 145. ■ First, general dam-

ages are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach. Second, if special circumstances caused some unusual injury, special damages are not recoverable therefor unless the circumstances were known or should have been known to the breaching party at the time he entered into the contract. The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 815, p. 733.)

*Hadley* v. *Baxendale* appears to require actual notice of the buyer's requirements by the seller before recovery in excess of the difference between the market price and the contract price is permitted. The portion of the decision most widely quoted reads:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect to such breach of contract should be such as would fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made *were communicated by the plaintiff to the defendant,* and thus known to both parties, the damages resulting from the breach of such contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from the breach of contract under these special circumstances so known and communicated." (*Hadley* v. *Baxendale, supra,* 156 Eng.Rep. 145, 151, italics added.)

Contract cases not involving the sale of goods, have not precluded the recovery of lost profits as damages. The objection that lost profits damages are "collateral" or "remote" has been raised and rejected from the time that the earliest cases were decided awarding such damages. (See *Shoemaker* v. *Acker* (1897) 116 Cal. 239 [48 P. 62]; *Schiffman* v. *Peerless Motor Car Co.* (1910) 13 Cal.App. 600 [110 P. 460].) In the latter case, the court disposed of the objection by stating:

"When profits and advantages are expressly stipulated for in the contract, and are the real purpose and direct and immediate fruit of a contract, they

are part and parcel of it and must be considered as entering into and constituting a portion of its very elements. (*Shoemaker* v. *Acker*, 116 Cal. 245 . . . .) In such a case it cannot be said that the profits are collateral or remote." (13 Cal.App. at p. 604.)

Plaintiff herein relies on *James* v. *Herbert* (1957) 149 Cal.App.2d 741 [309 P.2d 91], in which the court, over an objection that lost profits were not within the contemplation of the parties, stated that it would be *presumed* that lost profits were contemplated by the parties where the object of the contract is profits; the lost profits are therefore recoverable as damages. The court stated:

"Where the prospective profits are the natural and direct consequences of the breach of the contract they may be recovered. Profits are part and parcel of the contract itself, entering into and constituting a portion of its very element; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement." (*Id*. at p. 749.)

The California Supreme Court cited and quoted this language with approval in *Nelson* v. *Reisner* (1958) 51 Cal.2d 161, 171 [331 P.2d 17]. ■ The only prerequisite to recovery of lost profits is proximate causation: the lost profits must be the natural and direct consequences of the breach. This rule is to be applied in any action for damages for breach of contract. (Civ. Code, § 3300.)

Corporate defendant is correct in its assertion that California has limited contract damages to damages reasonably within the contemplation of the parties as a probable result of a breach at the time the contract was formed, citing *California P. Mfg. Co.* v. *Stafford P. Co.* (1923) 192 Cal. 479, 483 [221 P. 345, 32 A.L.R. 114]. However, the question of whether or not lost profits was the proper measure of damages or were within the contemplation of the parties at the time of contracting was not raised before the trial court. At trial, defense counsel acceded the point that if defendants, or any of them, were liable for breaching the contract, then lost profits was the proper measure of damages. Only the extent and calculation of those lost profits were disputed. It is not the province of this court to now determine that this position was unwarranted or that the trial court erred in not questioning counsel's posture on a recognized measure of damages under appropriate circumstances.

Corporate defendant's assertion that "[a]s a matter of law, the fact that plaintiff does not own defendant's accounting practice precludes a conclusion that defendant's breach of contract proximately caused plaintiff to lose profits from that practice" misses the point and serves only as a "red herring." The objective of the law is to place the injured party in the same position he would have held were it not for the breach. The only purpose in entering into the "Joint Venture, Management and Sales Agreement" was to ultimately acquire ownership of the corporate defendant's accounting practice and generate profits therefrom. If the contract had not been breached, plaintiff would have complete and sole ownership of the accountancy corporation.

Section 3301 of the Civil Code states that "no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

■■■ The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. (5 Corbin, Contracts, *supra*, Damages, § 1009, p. 77.) If, because of his own education, training, and information, he had reason to foresee the probable existence of such circumstances, the judgment for compensatory damages measured by the extent of such injury will be given against him. In such a case the defendant knew or had reason to know of the surrounding circumstances and had such reason to foresee the extent of the resulting injury as would have affected the conduct of the ordinary man and would have prevented him from committing the breach of contract. (*Op. cit. supra*, § 1014, p. 97.)

■■■ It is well settled that "[o]ne whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness." (*Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 297-298 [149 P.2d 177].) "[L]oss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof." (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111]; *Mahoney* v. *Founders' Ins. Co.* (1961) 190 Cal.App.2d 430, 436 [12 Cal.Rptr. 114]; *Edwards* v. *Container Kraft Carton etc. Co.* (1958) 161 Cal.App.2d 752, 760 [327 P.2d 622].) ■■■ "[I]t appears to be the *general rule that while a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment.*"

(*Stott* v. *Johnston* (1951) 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R.2d 580].)

Mr. Dillon J. Gnagy, a certified public accountant, testified to a projected rate at which the practice, assuming it had been taken over completely by plaintiff on October 31, 1983, the date of the breach, would grow at a 20 percent rate the first year, 15 percent the second year and 10 percent the third year, and 5 percent for years four through ten. From these figures Gnagy computed the present value of the future stream of income, which he compared to the contract purchase price to arrive at the present value of the lost profits damages being claimed by plaintiff.

■ The trial court concluded that plaintiff had incurred two types of damages, i.e., loss of profits damages and damages incurred in minimizing its loss as the result of the breach of contract. This finding is supported by the testimony of Mr. Gnagy.

The trial court need not have questioned the apparent concession of the defendants that Mr. Kevorkian knew or had reason to know because of his own education, training, information and the circumstances of contracting between the parties, as well as the nature of the contract itself, that plaintiff would suffer lost profits as a result of a breach by defendants.

The trial court based the amount of its award of lost profits upon the expert testimony of Dillon Gnagy. Gnagy based his testimony upon a review of the actual income and expenses of the corporate defendant's accounting practice and projected these for a period of 10 years from October 31, 1983. The trial court utilized this projection in calculating and adjusting the damages for loss of profits to the date of final judgment. This testimony and the exhibits submitted by plaintiff provide substantial evidence for the trial court's award of lost profits. The trial court's conclusion that a five-year period to measure lost profits was more appropriate than the ten-year period proposed by Gnagy is a question of fact purely within the province of the trial court in this case.

## II. Mitigation Damages

Corporate defendant contends that if it is not liable for lost profit damages as urged above, corporate defendant is also not liable for damages arising from plaintiff's attempt to mitigate such lost profit damages by opening a new practice. Since we have resolved the foregoing issue against the corporate defendant, there is no need of any further discussion of this issue.

### III. Reasonability of Attempt to Mitigate Breach of the Sale Contract by Opening a New Business in Fresno

Corporate defendant next contends it was unreasonable for plaintiff to attempt to mitigate breach of the sale contract by opening a new business in Fresno. Defendant argues that the evidence is such as to infer that plaintiff would have more effectively mitigated damages by purchasing an existing practice; a small practice with clients would avoid the "horrendous" losses admittedly suffered by new practices for the first two, three or four years of their operation. This was, after all, the rationale behind initially attempting to purchase the George Kevorkian Accountancy Corporation.

■ The question that the corporate defendant puts to this court is one of fact and therefore must be viewed under the substantial evidence test.

"[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]; *Estate of Silverstein* (1984) 159 Cal.App.3d 221, 226 [205 Cal.Rptr. 294].)

■ A party injured by a breach of contract is required to do everything reasonably possible to negate his own loss and thus reduce the damages for which the other party has become liable. (*Spurgeon* v. *Drumheller* (1985) 174 Cal.App.3d 659, 665 [220 Cal.Rptr. 195].) The plaintiff cannot recover for harm he could have foreseen and avoided by such reasonable efforts and without undue expense. (*Ibid.*) However, the injured party is not precluded from recovery to the extent that he has made reasonable but unsuccessful efforts to avoid loss. (*Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 239 [56 Cal.Rptr. 435].)

The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract. (*Vitagraph, Inc.* v. *Liberty Theaters Co.* (1925) 197 Cal. 694, 697-699 [242 P. 709]; *Rosenberger* v. *Pacific Coast Ry. Co.* (1896) 111 Cal. 313, 318 [43 P. 963].) Inasmuch as the law denies recovery for losses that can be avoided by reasonable effort and expense, justice requires that the risks incident to such effort should be carried by the party whose wrongful conduct makes them necessary. (5 Corbin, Contracts, *op. cit. supra,*

Damages, § 1044, p. 275.) Therefore, special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages. (*Vitagraph, Inc.* v. *Liberty Theaters Co.*, *supra*, 197 Cal. 694; *Rosenberger* v. *Pacific Coast Ry. Co.*, *supra*, 111 Cal. 313.)

In the instant case, the trial court concluded the plaintiff was entitled to recover, as additional mitigation damages, the net operating loss which it incurred for the initial period of almost three years following defendant's breach in which it opened up its own office in Fresno for the practice of accounting. Because plaintiff's Fresno business commenced earning a profit after the third year, the trial court did not award damages beyond that period of time or offset subsequent profits against initial losses. However, as we shall show, failure of the trial court to offset the initial loss incurred in the attempt to mitigate damages against the subsequent profit earned in this endeavor was error.

The trial court in determining whether these initial mitigation damages were reasonable might well have considered the length of time it initially took these parties to negotiate the purchase of the George Kevorkian Accountancy Corporation. Plaintiff initially began searching for an existing accountancy practice in the Fresno area in the latter half of 1981. Negotiations between Mr. Brandon and Mr. Kevorkian were conducted in November and December of that year. The negotiations were then disrupted by the tax season. During the next few months, two proposals were rejected and subsequently Mr. Kevorkian caused a joint venture agreement to be prepared which again delayed the purchase of the accountancy practice in question for a maximum of three years. The final agreement was signed May 21, 1982. Thus, plaintiff could not reasonably expect to become sole owner of the Fresno practice until July 1, of 1988. Time, it has oft been said, is money. Plaintiff had clients to serve. While it would have been within the province of the trier of fact to conclude this was an unreasonable method to mitigate damages, the evidence supports the trial court's conclusion that starting a new business was indeed reasonable under the circumstances. Thus, evidence or inferences raised by the evidence that plaintiff made reasonable efforts to engage in the accounting business in Fresno following the breach constitutes substantial evidence of the propriety of the trial court's finding. Mr. Brandon testified to plaintiff's long-range plans for the expansion of its practice into the Fresno area. These plans were frustrated and delayed as a result of the breach of the agreement. The necessity, testified to by plaintiff and uncontradicted by any evidence offered by the defense, to get into the accounting business in the Fresno area "very fast, very serious, very dedicated" supports the trial court's conclusion.

## IV. The Offset of Profits Earned in Plaintiff's Fresno Practice Against the Damages for Lost Profits From Defendant's Practice

Defendant also contends the trial court erred in failing to offset profits earned in plaintiff's Fresno practice against the damages for lost profits from the corporate defendant's practice. Defendant acknowledges that an injured party who makes a reasonable attempt to mitigate his damages is allowed to recover the cost of such reasonable mitigation effort as damages from the party who breached the contract, citing, inter alia, *Barnes* v. *Berendes* (1903) 139 Cal. 32, 35-36 [72 P. 406]. And, citing Corbin, defendant acknowledges that this should be so even in cases where the reasonable effort has failed and the expenditure in the attempt to avoid losses has merely increased them. (5 Corbin, Contracts, *supra*, Damages, § 1044, pp. 275-277.)

Corporate defendant explains that the trial court awarded plaintiff a total of $645,451.25 (plus discretionary interest) for five years' lost profits. The trial court awarded the corporate defendant a purchase price offset of $461,799.62 (plus discretionary interest) against the lost profits damages. Thus, the trial court awarded plaintiff a net $183,651.63 as damages for lost profits for a five-year period ending October 31, 1988. The trial court further found that plaintiff made a net profit of at least $120,000 in the fourth year of its new Fresno practice and anticipated an increase to $144,000 in the fifth year of the new practice. Thus, the trial court found that the probable profits from plaintiff's new practice in its fourth and fifth years of operation would be about $266,000. Corporate defendant complains the trial court refused to give the corporate defendant credit for plaintiff's probable profit of $266,000 from its last two years of operation against the $183,651.63 awarded to plaintiff as damages for lost profits from the corporate defendant's business.

The court decided against offsetting the profit against the amount spent by plaintiff in its mitigation efforts on the following basis:

"(1) In the matter which is presently before the Court, the Court has found that the damages by way of lost profits which the plaintiffs have suffered is the result of the defendants' repudiation and breach of their agreement to sell the accounting practice. On October 31, 1983, Brandon & Tibbs were not precluded from opening their own accounting practice, their right to do so was not the result of the defendants' repudiation and breach of their obligation to sell the accounting practice, but rather the defendants' conduct which justified a dissolution of the Joint Venture Agreement and the resulting release from the 'noncompetition clause' contained therein paragraph 'r' page 5 of the May 21, 1982 agreement.

"(2) The plaintiffs are not entitled to, nor are they awarded any damages by way of 'lost profits' as a result of the breach of the Joint Venture and Management Agreement."

The trial court further held that the profits in question could not be used to offset the losses incurred in the first three years of the new practice stating:

"(1) The expense which Brandon & Tibbs incurred in establishing their own accounting practice in Fresno, in the attempt to minimize their losses, specifically the sum of $154,292.00, were reasonable expenses which they incurred and thus recoverable as additional damages. The profits which were earned by Brandon & Tibbs, and which were reflected in Exhibit 20 are not to be offset against the damage which Brandon & Tibbs suffered, whether by way of expense incurred in mitigation or loss of profits.

"(2) It was not the defendants' breach of the purchase and sales agreement which enabled the plaintiffs to establish their own practice after October 31, 1983.

"(3) The Joint Venture and Management Agreement and the obligation of the parties thereunder are separate and apart from the obligation and rights of the parties under the purchase and sales agreement dated May 21, 1982."

Thus, due to the dissolution of the joint venture agreement, the trial court found plaintiff was not bound by the noncompetition clause and therefore the profits of the fourth and fifth years did not result from the breach.

■ In our view, defendant's contention that the profit plaintiff eventually earned in its attempt to mitigate damages should have been applied as an offset against plaintiff's loss of profits from the contract breach is correct *but*, in doing so, the last two years' mitigation profit, estimated by the trial court to be $266,000, must first be reduced by the first three years' cumulative losses, $186,729.65, resulting in a net profit from mitigation efforts of $79,270.35. This sum would then be deducted from the court's net loss of profits finding, $183,651.63, resulting in a net judgment to plaintiff of $104,381.28 plus interest and attorney fees. However, the $266,000 profit figure utilized by the trial court was only a "probable" or estimated figure and, thus, it appears a remand is necessary for the trial court to determine, as close as possible, the exact net profit earned by plaintiff from mitigation efforts over the five-year period adopted by the court and, then utilizing that figure, engage in the calculation of net loss suffered by plaintiff as above

described. Such remand will be for the limited purpose described, new evidence on only this limited issue is to be admitted and, as we shall find, all other aspects of the judgment below will be affirmed here and become the law of the case. Of course, interest on plaintiff's recalculated damages will also have to be recalculated.

### V. Whether Mitigation Damages Exceeded Damages to Be Saved by the Mitigation Attempt

Defendant complains that the damages incurred by plaintiff in mitigating its losses exceeded the damages to be saved by the mitigation attempt and the trial court erred in awarding plaintiff mitigation damages in excess of the damages to be saved by the mitigation attempt, citing *Barnes* v. *Berendes, supra*, 139 Cal. 32, 35-36, and *Kleinclaus* v. *Marin Realty Co.* (1949) 94 Cal.App.2d 733, 739 [211 P.2d 582].

Corporate defendant argues:

"The trial court awarded plaintiff $154,232.00 plus discretionary interest as mitigation damages. . . . The trial court also awarded plaintiff $183,651.63 plus interest as compensation for all recoverable future lost profits from the defendant's business.

"However, the $183,651.63 lost profit award cannot be used to justify the expenditure of $154,232.00 in mitigation damages.

"If plaintiff is allowed to recover $183,651.63 from defendant as damages for future lost profits, the $183,651.63 could not have been saved by the mitigation attempt—profits saved by the mitigation attempt clearly are not 'lost' profits. And if the $183,651.63 was saved by the mitigation attempt, plaintiff clearly cannot recover this amount as damages from the defendant—defendant obviously was not damaged in the amount of any profits which were saved by its mitigation effort.

"This argument does not apply if the profits from the mitigation attempt are offset against the damages for future lost profits from defendant's business as urged in Point 4 above. If the offset is allowed, plaintiff spent $154,232.00 to save $183,651.63 in lost profits, and the legal requirement that the mitigation damages be no greater than the damages to be saved is met."

In making this argument, corporate defendant compares the mitigation damages to the *net* loss of profits damages. As noted, the trial court

awarded plaintiff specific damages for loss of profits in the sum of $724,807.18 and merely offset this loss against the purchase price payable to the corporate defendant for its accounting practice in the sum of $584,733.45, resulting in a net recovery of $140,073.33. Thus, the total loss of profits damages in the amount of $724,807.18 clearly exceeds the mitigation damages of $186,729.65. Moreover, the offset for the purchase price is not a factor to be considered in determining whether mitigation damages exceed loss of profits damages. Thus, the mitigation damages are not disproportionate and are reasonable under the circumstances. Moreover, as we have shown, when mitigation losses are offset against mitigation profits, a net profit of approximately $79,270.35 results which in turn further reduces plaintiff's net, or possibly net-net, loss from defendant's breach. If for no other reason than this, defendant's argument must fail.

Finally, we are not satisfied corporate defendant's claim that "[t]he amount of damages recoverable for a mitigation attempt is limited to the amount of damages to be saved by such attempt[] (*Barnes* v. *Berendes*, *supra*, 139 Cal. 32, 35-36; *Kleinclaus* v. *Marin Realty Co.*, *supra*, 94 Cal.App.2d 733, 739[])" is a correct statement of the law as applied to the facts here. *Kleinclaus* v. *Marin Realty Co.* does state:

"The reasonable cost involved in mitigating damages is always recoverable, provided it does not exceed the damages prevented or reasonably anticipated. (4 Rest. Torts, § 919; 15 Am.Jur., Damages, § 27, p. 423, § 147, pp. 554-555; 8 Cal.Jur., Damages, § 43, p. 783.)" (*Kleinclaus* v. *Marin Realty Co.*, *supra*, 94 Cal.App.2d 733, 739.)

However, *Kleinclaus* did not involve a factual situation in which the mitigating damages exceeded the damages sought to be prevented. On this point, *Kleinclaus* has only been cited in one other published decision, that of *Hartong* v. *Partake, Inc.* (1968) 266 Cal.App.2d 942, 968 [72 Cal.Rptr. 722]. *Hartong* also did not involve a situation where the expense of minimizing the damages exceeded the damages sought to be prevented. *Hartong* has never been cited for the proposition posed by the corporate defendant.

*Hartong* relies upon *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578 [271 P.2d 122], which involved an injury that plaintiff's own proof established was not repairable, i.e., that the cost of restoration would exceed the value of the remaining production. (*Id.* at p. 607.) The court held that the plaintiff was entitled to recover an amount equal to the value of its wealth as it existed prior to this cessation of production, plus any reasonable expense incurred in its effort to restore the well to

production up to the time of its determination that further efforts at restoration were impractical, less the value of any salvage realized. (*Ibid.*)

But, most importantly, *Basin Oil Co.* v. *Baash-Ross Tool Co.* and the cases relied upon therein are "properly understood as stating, within the context of a total diminution in value [of land], an obvious adjunct of the general rule that a plaintiff who seeks restoration damages cannot recover more than the amount of diminution in value of the *land*, i.e., that a recovery for diminution in value can never exceed the value of the *land* prior to the injury." (*Heninger* v. *Dunn* (1980) 101 Cal.App.3d 858, 863 [162 Cal.Rptr. 104], italics added.) In other words, *Basin Oil Co.* is concerned with the proper measure of damages for negligent injury to land and is, therefore, not applicable to the instant case. Nor is *Barnes* v. *Berendes* applicable for the same reasons.

American Jurisprudence explains that the "doctrine of avoidable consequences is simply one of good faith and fair dealing.[] The injured person need not make extraordinary efforts to do what is unreasonable or impracticable in his efforts to minimize damages; reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activity.[] More completely stated, the consequences of an injury are recoverable where the injured party acts with such care and diligence as a person of ordinary prudence would under the circumstances, and his efforts to minimize damages are determined by the rules of common sense, good faith, and fair dealing.[]

"Whether one has acted reasonably in avoiding damages is a question of fact. The court normally looks at what the plaintiff actually did and determines whether the plaintiff's mitigation efforts were reasonable.[] What constitutes reasonable care depends upon the circumstances of the particular case, taking into consideration time, knowledge, opportunity, and expense.[]" (22 Am.Jur.2d, Damages, § 498, pp. 582-583, fns. omitted.)

Thus, there is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property and whatever formula is most appropriate in the particular case will be adopted. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751]; *Basin Oil Co.* v. *Baash-Ross Tool Co.*, *supra*, 125 Cal.App.2d 578, 606.) The question is whether the sums expended were reasonable in amount and expended in good faith for purposes of mitigating the losses inflicted. (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 272 [42 Cal.Rptr. 89, 398 P.2d 129].)

Whether the injured party acted reasonably is a question of fact. (*Jegen* v. *Berger* (1946) 77 Cal.App.2d 1, 11 [174 P.2d 489].) Corporate defendant

has failed to establish that the trial court abused its discretion in determining that these expenditures met the test of reasonableness and good faith. Thus, corporate defendant's argument in this regard must be rejected.

### VI. Failure to Offset Profits Earned in Plaintiff's Fresno Practice Against the Initial Losses From That Practice

Corporate defendant further complains that the trial court erred in failing to offset profits earned in plaintiff's Fresno practice against the initial losses from that practice. As stated, the trial court awarded plaintiff $154,232 plus discretionary interest for the losses which plaintiff incurred in the first three years of its Fresno practice as mitigation damages. However, the trial court refused to offset the profits earned by plaintiff's Fresno practice in the fourth and fifth years against the losses incurred in the first three years of that practice. Corporate defendant complains that having been required to pay a substantial amount for the start-up costs of plaintiff's new practice, the corporate defendant was improperly denied any benefit from the profits generated by that practice.

As we have stated in parts IV and V of this opinion, we substantially agree with plaintiff's argument in this regard subject to our formularization of how to arrive at plaintiff's net damages as previously described. The purpose of allowing an injured party to attempt to mitigate damages, and to be awarded further damages for reasonable but unsuccessful attempts to do so, is simply to minimize or even, on occasion, wipe out damages resulting from a party's breach. In the instant case, plaintiff initially sustained a substantial loss in its attempt at mitigation. However, these efforts were eventually rewarded during the timeframe selected by the trial court resulting in a net profit from the mitigation efforts. This sum, the net profit, must be offset against plaintiff's other damages from defendant's breach. That is the purpose and theory of mitigation. To do otherwise would result in a double recovery for plaintiff.

### VII. Whether the Damages for Breach of the Contract Were Greater Than Could Have Been Gained Upon Full Performance of the Contract

According to defendant, plaintiff recovered greater damages for the contract breach than it could have gained by the full performance of the contract in violation of section 3358 of the Civil Code.

Civil Code section 3358 provides:

"Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides."

An injured party may recover for a breach of contract the amount which will compensate it "for all the detriment proximately caused [by the breach], or which, in the ordinary course of things, would be likely to result [from the breach]." (Civ. Code, § 3300.) The damages awarded should, insofar as possible, place the injured party in the same position it would have held had the contract properly been performed, but such damages may not exceed the benefit which it would have received had the promisor performed. (Civ. Code, § 3358; *Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 648, 649 [160 P.2d 804]; *Burnett & Doty Development Co.* v. *Phillips* (1978) 84 Cal.App.3d 384, 389 [148 Cal.Rptr. 569].) Damages may be awarded for breach of contract for those losses which naturally arise from the breach, or which might reasonably have been foreseen by the parties at the time they contracted, as the probable result of the breach. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 125 [135 Cal.Rptr. 802].)

 Where the injured party shows that, as a reasonable probability, profits would have been earned on the contract except for its breach, the loss of the anticipated profits is compensable. (*Nelson* v. *Reisner, supra*, 51 Cal.2d 161, 171-172.) Where business activity has been interrupted by a breach of contract, damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable where such damages are shown to have been foreseeable and reasonably certain. (See *Grupe* v. *Glick* (1945) 26 Cal.2d 680, 692 [160 P.2d 832]; *Guntert* v. *City of Stockton* (1976) 55 Cal.App.3d 131, 143 [126 Cal.Rptr. 690, 127 Cal.Rptr. 602].)

As has also been stated previously, the nonbreaching party has a duty to mitigate these damages and reasonable expenses incurred in a good faith attempt to do so are recoverable even if the effort to mitigate damages fails. This principle necessarily contemplates that plaintiff is entitled both to lost profits and to its mitigation expenses, if any. The trial court's decision to award plaintiff lost profit damages is clearly within the doctrine enunciated and we have reversed and remanded for the trial court's error in failing to offset net mitigation profits against plaintiff's net breach of contract damages.

*VIII. Sufficiency of the Evidence re Lost Profits*

Corporate defendant contends that the trial court's finding the plaintiff lost profits from defendant's business in the amount of $183,651.63 in five years is not supported by substantial evidence.

The trial court's lost profits award was based upon the testimony of plaintiff's expert, Mr. Gnagy, a certified public accountant.

Corporate defendant acknowledges that Mr. Gnagy's testimony supports the finding of lost profits in the amount of $183,651.63 but argues that the method used by Mr. Gnagy to project the purported lost profits in that amount was inherently flawed.

Mr. Gnagy calculated lost profits resulting from corporate defendant's failure to sell its practice to plaintiff as of October 31, 1983 (the date of breach), by (1) projecting gross revenue for the hypothetical "purchased" practice based upon annual growth percentages selected by him and applied to the annualized gross revenue of the joint venture and then (2) subtracting hypothetical expenses from the projected gross revenue figures, based upon (a) an asserted profession-wide "rule of thumb" that each dollar of gross revenue "costs" 50 cents in salary and related payroll expenses and (b) nonpayroll expenses projected using the annualized expenses of the joint venture (with certain minor exceptions).

Corporate defendant complains that Mr. Gnagy's calculation gave no consideration as to how Mr. Kevorkian's absence would affect the productivity of the practice, noting that Mr. Kevorkian worked many more hours per year than the average certified public accountant. While Mr. Gnagy asserted that his method of calculation included consideration of the compensation which would have to be paid to a resident partner, he did not explain how his calculations accounted for this element.

Corporate defendant acknowledges that Mr. Gnagy's procedure for projecting lost profits comports with the American Institute of Certified Public Accountants' (AICPA) method of calculating profits. Yet, defendant complains Mr. Gnagy unreasonably discarded the notion of compensation for such a working partner as Mr. Kevorkian in the "continued" practice.

In our view, the method of calculation selected by Mr. Gnagy simply goes to the weight to be given Mr. Gnagy's expert opinion evidence. It is for the trier of fact to accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial

court's award of lost profits in the sum of $183,651.63. (See *Estate of Silverstein, supra,* 159 Cal.App.3d 221, 226.)

### IX. Compensation for the Month of July 1982

Corporate defendant asserts that the trial court erred in failing to allow Mr. Kevorkian $10,000 as compensation for the month of July 1982.

As corporate defendant points out:

"By order of 29 September 1988, the trial court approved the accounting submitted by plaintiff on 17 June 1988 . . . .

"Exhibit A to plaintiff's approved 17 June 1988 accounting is an income statement of the joint venture . . . . For the month of July 1982 this income statement shows the following:

"$23,833.00 = total joint venture revenue
"$15,833.00 = total income before defendant's compensation
"$50,000.00 = debit for consulting fee to defendant
"$34,167.00 = loss before payment of defendant's compensation
"0.00 = defendant's compensation for the month.

"The $34,167.00 operating loss in July 1982 caused defendant's compensation for that month to be reduced to $0.00 because paragraph (n) of the contract requires a dollar for dollar reduction and defendant's normal $10,000.00 per month compensation when there is an operating loss in any compensation period . . . ."

Corporate defendant argues that the accounting is wrong because it does not include plaintiff's $50,000 payment to the joint venture in July 1982 as income in that month. Corporate defendant asserts that if the $50,000 payment to the joint venture was not a capital contribution, "it necessarily was some sort of revenue to the joint venture and should have been included as revenue in the accounting for July 1982, the joint venture's first month of operation."

In its statement of decision dated February 18, 1988, the trial court found, based on James Brandon's testimony, that at the commencement of the joint venture, Brandon & Tibbs deposited $75,000 in the joint venture account and the $50,000 in compensation was *paid to George Kevorkian Accountancy Corporation out of that sum.* The court determined that it was a one-time nonrefundable deposit. After hearings regarding the accountan-

cy issues on September 28, 1988, the trial court filed an order approving the final accounting submitted by plaintiff.

The management, joint venture and sales agreement provided:

"BRANDON, TIBBS & KEVORKIAN shall pay to Kevorkian as compensation for the consulting services of Kevorkian, the sum of $50,000.00 on July 1, 1982, and thereafter, the sum of $10,000.00 per month for compensation, and for the leasing of equipment of Kevorkian . . . ." In addition, plaintiff was to receive 50 percent of the joint venture net profits and 50 percent of all sums received for billings for accounting services by Brandon. The agreement was signed by the parties on May 21, 1982, and provided that the agreement "shall be for a period of three (3) years beginning July 1, 1982 . . . ."

Brandon testified that Brandon & Tibbs "put in $55,000.00 right up to the first day . . . . A check was written the first day to that—it was started 50,000 to George Kevorkian Accountancy Corporation to fulfill the contract." "The 50,000 was the down payment on the practice."

"We borrowed 75,000—we actually, come to think of it, deposited all 75,000 to the joint venture. We transferred 20,000 back to establish enough for the payroll account and left 5,000 in for monthly expenses and 50,000 went to Mr. Kevorkian. But we borrowed 75,000 for the joint venture."

Thus, Brandon testified and the trial court found that the check for $50,000 was written at the commencement of the joint venture to George Kevorkian Accountancy Corporation; the court found that it constituted a one-time nonrefundable deposit rather than a contribution. The Brandon-Tibbs and Kevorkian partnership income statement shows the monthly revenues of the joint venture for July as $23,833. A one-time "G. K. consulting fee" of $50,000 is deducted in July of 1982 causing a net loss for that month.

The check was made payable to George Kevorkian Accountancy not Brandon, Tibbs & Kevorkian; thus it was not income to the joint venture. Therefore, the consulting fee was not "some sort of revenue to the joint venture" and was properly not included as revenue in the accounting for July 1982. Corporate defendant's argument must fail.

*Issues on cross-appeal*:

## X. Whether the Trial Court Erred in Making a Double Calculation of Interest on the Offset

Plaintiff explains the trial court found that the payment price for the purchase of the accounting business was to have been made under the terms of the agreement in three installments within a twenty-five-month period in the sum total of $400,983.75. The court further found that the agreement provided for interest payable on the purchase price of 14 percent per annum under the terms of the agreement, which was calculated at $60,815.87. The agreed purchase price plus the 14 percent interest factor was found by the court to be an offset against lost profit damages. In its order upon reconsideration and recomputation of damages, the court increased the amount of the offset of $400,983.75 together with interest at 14 percent per annum by adding the additional sum of interest at 7 percent on each installment payment which, theoretically, would have been paid to the corporate defendant had plaintiff purchased the accounting business pursuant to the terms of the agreement. It is the addition of the 7 percent interest to the periodic installments under the agreement that plaintiff, Brandon & Tibbs, claims was error.

The trial court determined that interest on the lost profits should accrue from date of ascertainment to date of judgment. Interest on the mitigation expenses was to accrue from date of ascertainment to date of judgment also. The court also stated:

"5. With respect to the computation of the offset on account of the amount of plaintiff's cost of purchase (but for the breach) such amount should be calculated by use of the amount of each installment payment of principle [*sic*] and interest together with interest on each such installment payment from the date the installment was due and payable to date of judgment. The basis for the Court's attribution of interest to the date of judgment is that by nonpayment of such amounts plaintiff has had the continued use and benefit thereof and to not include such interest factor would result in unjust windfall to plaintiff.

"6. Plaintiff having filed its complaint herein on November 22, 1983 no interest herein fixed in the discretion of the Court precedes the date the action was filed (§ 3287(b) Civil Code)."

Plaintiff argues since the trial court had already awarded to the corporate defendant interest on the purchase price due under the agreement at 14

percent per annum (to the date such payment was due but for corporate defendant's breach), the corporate defendant had been given the benefit of its bargain as an offset.

The corporate defendant argues, however, that "based upon the assumption that the trial court's quasi-specific performance method of computing breach of contract damages is not grievous error," no error occurred in awarding the additional 7 percent interest.

 In our view since the trial court accepted plaintiff's argument that prejudgment interest should be allowed to the date of judgment and increased the award for breach of contract damages by $177,718, allowing interest upon each of 3 payments at 14 percent for the first year and 7 percent thereafter until the date of judgment, i.e., September 30, 1988, was also proper and does not constitute a double payment to corporate defendant or double offset. It appears to us the trial court merely applied a 7 percent interest factor to all items or categories of damages sustained by plaintiff *and* to all items of offset to which corporate defendant was entitled in arriving at a net or bottom line total of damages owed by corporate defendant to plaintiff by reason of corporate defendant's breach of the subject contract. Thus, neither plaintiff nor corporate defendant received a windfall at the other party's expense.

On the other hand, corporate defendant argues that the trial court erred in reducing the 14 percent interest rate specified in the sale contract to 7 percent in computing the amount of purchase price offset against lost profit damages, citing Civil Code section 3289, subdivision (a).

Section 3289 of the Civil Code provides in relevant part: "(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation."

Corporate defendant explains that the trial court allowed the corporate defendant a total offset of $122,933.84 for interest at 7 percent. When the contract interest rate of 14 percent is applied, the correct purchase price offset for interest is exactly double the $122,933.84 allowed, or $245,867.68. Corporate defendant claims to have been prejudiced in the sum of $122,933.84.

Corporate defendant's argument in this respect is equally specious. The court did not award corporate defendant 14 percent interest in performance or furtherance of the contract. Corporate defendant had breached the

contract, refused to sell the accounting practice to plaintiff as agreed, and was thereafter not entitled to any performance or enforcement of the agreement, or to any damages. The contract was, in effect, superseded by its breach. Rather, and as previously explained, the trial court merely calculated what plaintiff was required to pay to corporate defendant by the terms of the contract, including the 14 percent interest factor to the dates periodic payments would have been due, in calculating the total offset to which corporate defendant was entitled in arriving at plaintiff's net damages. Corporate defendant's argument in this regard it meritless. However, as we have previously stated, interest to plaintiff will have to be recalculated once a net damages award has been determined upon remand.

### XI. Whether the Trial Court Erred in Concluding That the Individual Defendant George Kervorkian Was Not Liable to Plaintiff for Any Damages

Plaintiff claims the trial court erred in concluding that the individual defendant George Kevorkian was not liable to plaintiff for any damages.

Plaintiff Brandon & Tibbs asserts for the first time on appeal that George Kevorkian should have been found by the trial court liable as an individual for the acts of the corporate defendant as its alter ego. Plaintiff cites two cases for the proposition that where no prejudice appears, this issue may be raised for the first time on appeal, i.e., *Carey* v. *Glenco Citrus Products* (1965) 235 Cal.App.2d 572, 576 [45 Cal.Rptr. 365]; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc.* (1958) 166 Cal.App.2d 652, 655 [333 P.2d 802]. Assuming, without deciding, that this issue is cognizable on appeal, the meritlessness of the argument glares from the pages of plaintiff's brief. To quote plaintiff:

"In reaching these conclusions, the trial court based the conclusions upon findings which could just have well been a basis for concluding that George Kevorkian, individually, was equally liable for the CORPORATE DEFENDANT for PLAINTIFFS [*sic*] damages."

The above quoted language concedes that substantial evidence appeared in the record to support the trial court's relevant factual findings regarding George Kevorkian's personal liability for breach of the contract, a concession with which we concur.

Thus, as corporate defendant points out, "[a]ssuming arguendo that the relevant findings also would support a judgment against George Kevorkian as urged by plaintiff, this does not show error."

The judgment is affirmed in part and reversed in part, in accordance with our findings and conclusions expressed herein. The matter is remanded for the limited purpose of determining, upon hearing, the net profit realized by plaintiff in the five-year period selected by the trial court. Upon determination of this sum, or figure, the trial court will recalculate the net damages suffered by plaintiff from defendant's breach of contract and, as necessary, interest awarded plaintiff before judgment will also be recalculated. In all other respects, the judgment is affirmed. Costs on appeal are denied both parties.

Best, P. J., and Ardaiz, J., concurred.