[Civ. No. 6141. Fifth Dist. Aug. 30, 1983.]

SUN-MAID RAISIN GROWERS OF CALIFORNIA,
Plaintiff and Respondent, v.
VICTOR PACKING COMPANY et al., Defendants and Appellants.

**[Certified for partial publication.*]**

---

*Parts I and V only pertaining to damages are certified for publication. Parts II-IV are not published as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

COUNSEL

Stark, Stewart, Wells & Robinson, John F. Wells, Ralph L. Baker, Baker, De Omé, Lipkin & Wright, and Robert W. Payne for Defendants and Appellants.

Blumberg, Sherr & Kerkorian, Barry F. Kriebel, and Gary Kerkorian for Plaintiff and Respondent.

**OPINION**

**FRANSON, Acting P. J.—**

## I

### THE CASE

Plaintiff and respondent Sun-Maid Raisin Growers of California (hereinafter Sun-Maid) filed a complaint against defendants and appellants Victor Packing Company and Pyramid Packing Company (hereinafter appellants or Victor). The complaint for injunctive relief, specific performance and damages alleged appellants had breached agreements to sell Sun-Maid 1,800 tons of raisins from the 1975 raisin crop by repudiating the contracts and refusing to deliver 610 tons of raisins which remained to be delivered under the contracts. The repudiation allegedly occurred on August 10, 1976.

After a court trial, judgment was issued in favor of Sun-Maid, holding appellants jointly liable for damages of $247,383, and Victor additionally liable for damages of $59,956, for a total of $307,339. In addition, Sun-Maid recovered its costs of suit. Findings of fact and conclusions of law were filed. After denial of appellants' motion for new trial, a timely appeal was filed.

### II-IV*

## V

### DAMAGES WERE FORESEEABLE

■ Appellants' precise argument on appeal is that the damages award of $295,339.40 for lost profits is excessive because "the *amount* of lost profits was unforeseeable by either party when the contracts were formed," citing *Hadley* v. *Baxendale* (1854) 9 Ex. 341, 156 Eng.Rep. 145. According

---

*Parts II-IV were not certified for publication. See footnote, *ante,* page 787.

to appellants, the foreseeability requirement applies not only to the fact that some profits might be lost as a result of the breach but also to the amount of profits thereby lost. Thus, "the foreseeability of extraordinary profits must itself be proved, even if the fact of ordinary . . . profits is either presumed or otherwise proved to be within the parties' contemplation." Appellants hinge their argument on the fact that the new crop in September was reduced in quantity and quality by "disastrous" rains which resulted in an extraordinary increase in the market price of raisins in November and December 1976.

Preliminarily, we observe that appellants made no foreseeability objection to Sun-Maid's evidence of damages at trial. It was only in appellants' post-trial brief that they argued the point.[8] Furthermore, appellants filed no objections to Sun-Maid's proposed findings on damages (Nos. 42, 43 and 44) and made no request for a specific finding on the foreseeability question.

We also observe that unless it can be ruled on as a matter of law, the question whether the buyer's consequential damages were foreseeable by the seller is one of fact to be determined by the trier of fact. (See Annot. (1979) 96 A.L.R.3d 299, 329, § 4b.) If supported by the evidence, the decision cannot be overturned on appeal.

The basic measure of damages for a seller's nondelivery or repudiation is the difference between the market price and the contract price. (Cal. U. Com. Code, § 2713.)[9] The market price to be used as the basis of the calculation is the market to which a buyer would normally go to effect cover. (§ 2713, subd. (2); 1 Cal. Commercial Law (Cont.Ed.Bar 1966) § 12.15, pp. 562-563.) Market price is measured as of the time the buyer learned of the breach—in this case August 10—at which time he could be expected to seek cover. (§ 2713, subd. (1).)

---

[8]Specifically, appellants argue in their posttrial brief, "Where buyer elects not to cover but to claim damages for breach of contract, he may recover for loss of profits only if the seller, at the time of contracting . . . had reason to know of the buyer's general and particular needs and requirements and such damages could not reasonably have been prevented by cover or otherwise" citing California Uniform Commercial Code sections 2713 and 2715.

[9]Section 2713, subdivisions (1) and (2), read:

"(1) Subject to the provisions of this division with respect to proof of market price (Section 2723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this division (Section 2715), but less expenses saved in consequence of the seller's breach.

"(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival."

If evidence of a price prevailing at the appropriate time or place "is not readily available," the price prevailing within a reasonable time before or after may be used. (§ 2723, subd. (2).)[10]

In addition to the difference between the market price and the contract price, the buyer can recover incidental damages such as expenses of cover (§ 2715, subd. (1)) and consequential damages such as lost profits (§ 2715, subd. (2)(a)) to the extent they could not have been avoided by cover. The inability to cover after a prompt and reasonable effort to do so is a prerequisite to recovery of consequential damages. (*Ibid.*) If the buyer is only able to cover in part, he is entitled to the net cost of cover (the difference between the cover price and the contract price plus expenses) together with any consequential damages as hereinafter defined (§ 2715) but less expenses saved in consequence of the seller's breach (§ 2712).

Under section 2715, subdivision (2)(a), consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting *had reason to know* and which could not reasonably be prevented by cover or otherwise; . . ." (Italics added.) The "reason to know" language concerning the buyer's particular requirements and needs arises from *Hadley* v. *Baxendale, supra,* 9 Ex. 347, 156 Eng.Rep. 145 (see Dunn, *Recovery of Damages for Lost Profits in California* (1974-75) 9 U.S.F.L.Rev. 415). The code, however, has imposed an objective rather than a subjective standard in determining whether the seller should have anticipated the buyer's needs. Thus, actual knowledge by the seller of the buyer's requirements is not required. The only requirement under section 2715, subdivision (2)(a), is that the seller reasonably should have been expected to know of the buyer's exposure to loss. (*Id.,* at pp. 420-421.)

Furthermore, comment 6 to section 2715 provides that if the seller knows that the buyer is in the business of reselling the goods, the seller is charged with knowledge that the buyer will be selling the goods in anticipation of a profit. "Absent a contractual provision against consequential damages a

---

[10]As explained in 1 California Commercial Law, *supra,* section 12.33, page 577, there are two qualifications on the right to introduce evidence of prices at different places or times: (1) evidence of the price at the actual time and place of breach must be "not readily available," and (2) notice must be given the other party. The party who wants to exclude evidence of a substitute price on the ground the proper price is readily available presumably can do so by offering proof of the proper price.

Since appellants offered no proof of a market price contrary to that offered by Sun-Maid, they must be deemed to have waived any contention that Sun-Maid's evidence of the market price of raisins on December 1, 1976, was not a proper alternative market price under section 2723, subdivision (2).

seller in breach [will] therefore always be liable for the buyer's resulting loss of profit." (1 Cal. Commercial Law, *supra,* § 12.20, p. 568, citing *Stott* v. *Johnston* (1951) 36 Cal.2d 864 [229 P.2d 348, 28 A.L.R.2d 580].)

Finally, a buyer's failure to take any other steps by which the loss could reasonably have been prevented bars him from recovering consequential damages. (§ 2715, subd. (2)(a).) This is merely a codification of the rule that the buyer must attempt to minimize damages. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 639-640, 670-674.)

In the present case, the evidence fully supports the finding that after appellants' breach of the contract on August 10, 1976, Sun-Maid acted in good faith in a commercially reasonable manner and was able to cover by purchase of only some 200 tons of substitute raisins at a cost of 43 cents per pound. ($860 per packed weight ton.) There were no other natural Thompson seedless free tonnage raisins available for purchase in the market at or within a reasonable time after appellants' breach. Although the evidence indicates that Sun-Maid actually was able to purchase an additional 410 tons of raisins after the September rainfall in their efforts to effect cover, these were badly damaged raisins which had to be reconditioned at a substantial cost to bring them up to market condition. According to Sun-Maid, if the trial court had used the total cost of cover of the full 610 tons as the measure of damages rather than lost profits on resale, their damages would have totaled $377,720.

Although the trial court did not specify why it determined damages by calculating lost profits instead of the cost of cover (no findings were requested), the court probably found that damages should be limited to the amount that would have put Sun-Maid in "as good a position as if the other party had fully performed." (§ 1106.) Thus, Sun-Maid was awarded the lesser of the actual cost of cover (treating the reconditioning of the 410 tons as a cost) and the loss of prospective profits.

In contending the foreseeability requirement applies to the amount of the lost profits and not just to the fact of lost profits, appellants apparently acknowledge that they knew at the time of contracting that Sun-Maid would be reselling the raisins to its customers in the domestic market. Appellants have no alternative to this concession since they were experienced packers and knew that Sun-Maid marketed raisins year round in the domestic market. They also knew that Sun-Maid substituted reserve raisins into their free tonnage in place of appellants' raisins which were shipped to Japan. Furthermore, appellants must be presumed to have known that if they did not deliver the full quota of raisins provided under the contracts (1,800 tons)

by the end of the crop year or before such reasonable time as thereafter might be agreed to, Sun-Maid would be forced to go into the market to attempt to cover its then existing orders for sale of raisins. This is exactly what occurred. When Peterson called Sahatdjian on August 10 and requested some 38 tons of raisins and Sahatdjian refused the order, Peterson stated, "Well, *we have orders here to fill*; and I'll have to tell Frank Light about it." (Italics added.) Within five minutes, Light called Sahatdjian and demanded to know what was going on. Sahatdjian again refused to deliver as requested but said he "would be glad" to deliver when the new crop came in.

A reasonable inference arises that apart from appellants' breach of contract, they intended to fulfill their obligations to Sun-Maid by acquiring raisins from the new crop which would be available in October. The fact that Sun-Maid requested only 38 tons on August 10 suggests that Sun-Maid also understood that appellants intended to deliver the balance of the raisins from the new crop.

The contemplation of the parties in August was consistent with Sun-Maid's industry-wide announcement in November 1975 that it needed raisins for sale in the domestic market "through 1976."

When the contract for sale involves repeated occasions for performance by either party with the knowledge of the nature of the performance and opportunity for objection to it by the other, any performance accepted or acquiesced in without objection shall be relevant to determining the meaning of the agreement. (§ 2208, subd. (1).) Since appellants had delivered only 1,190 tons by August and the amount of each delivery had been within their discretion, Sun-Maid's reliance on appellants' future performance of the contract by accepting orders from the domestic market must have been within the parties' contemplation. Thus, appellants had "reason to know" that their failure to deliver the 610 tons before the new crop came in would result in lost profits on resales by Sun-Maid.[11]

Finally, there is no showing that Sun-Maid's evidence of the price of raisins on December 1, which was used by the trial court to measure damages, did not accurately reflect the true state of the domestic market before the September crop was produced when free tonnage raisins were unavailable. The December price was a reasonable alternative market price to the

---

[11]Even if appellants had performed the contract by delivering 610 tons from the new crop, they would have had to pay the inflated price to acquire the raisins and, therefore, would have suffered over $300,000 in damages from their own losses on the contracts.

"not readily available" price on August 10 as required by section 2723, subdivision (2).

Appellants nonetheless contend they should not be liable for damages based on the extraordinarily high price of raisins in the fall of 1976 which was caused by the "disastrous" rains in September. These rains reportedly caused a 50 percent loss of the new crop which with the lack of a substantial carryover of 1975 raisins drove the market price from approximately $860 per packed weight ton to over $1,600 per packed weight ton.

Appellants do not assert the doctrines of impossibility or impracticability of performance as a defense. (§ 2615.) This is understandable since the nondelivery of raisins was not caused by the failure of a presupposed condition (continuance of the $860 per ton market price) but solely by appellants' failure to deliver the 610 tons of raisins during the 1975 crop year. This is where the trial court's findings of appellants' bad faith become pertinent. A reasonable inference may be drawn that from early spring appellants were gambling on the market price of raisins in deciding whether to perform their contracts with Sun-Maid. If the price would fall below the contract price, appellants would buy raisins and deliver them to Sun-Maid. If the market price went substantially above the contract price, appellants would sit tight. While we cannot read Sahatdjian's mind during the late spring and summer months, we can surmise that he speculated that the market price would remain below the contract price after the current crop year so that he could purchase new raisins for delivery to Sun-Maid at the contract price. He threw the dice and lost.

The possibility of "disastrous" rain damage to the 1976 raisin crop was clearly foreseeable to appellants. Such rains have occurred at sporadic intervals since raisins have been grown in the San Joaquin Valley. Raisin packers fully understand the great risk in contracting to sell raisins at a fixed price over a period of time extending into the next crop year. The market price may go up or down depending on consumer demand and the supply and quality of raisins. If the seller does not have sufficient inventory to fulfill his delivery obligations within the time initially required or as subsequently modified by the parties, he will have to go into the market to purchase raisins. The fact that he may be surprised by an extraordinary rise in the market price does not mean that the buyer's prospective profits on resale are unforeseeable as a matter of law.

## CONCLUSION

Once the trial court found that the contracts did not end either by March 1 or June 30, appellants were required to deliver the balance of the raisins

by September 1 or by such further time as the parties would have agreed to if the contracts had not been breached on August 10. Sun-Maid's damages for the cost of cover and lost profits on prospective resale were the natural, foreseeable and inevitable result of appellants' failure to deliver according to the contracts.

The judgment is affirmed.

Woolpert, J., and Martin, J., concurred.

A petition for a rehearing was denied September 23, 1983, and appellants' petition for a hearing by the Supreme Court was denied November 16, 1983.