**CIVIC CENTER DRIVE APARTMENTS LTD. PARTNERSHIP,**
et al., Plaintiffs,

v.

**SOUTHWESTERN BELL VIDEO SERVICES, Defendant.**

No. C–02–2955 JCS.

United States District Court, N.D. California.

Nov. 19, 2003.

Michael G. Long, Watt,Tieder, Hoffar & Fitzgerald LLP, Irvine, CA, Julian F. Hof-far, Watt, Tieder, Hoffar & Fitzgerald, LLP, McLean, VA, for Plaintiffs.

James G. Gilliland, Mehrnaz Boroumand, Townsend and Townsend and Crew LLP, San Francisco, CA, John C. Nabors, Matthew J. Schroeder, Gardere Wynne Sewell LLP, Dallas, TX, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Docket No. 90]

SPERO, United States Magistrate Judge.

## I. *INTRODUCTION*

On Friday, October 17, 2003 at 9:30 a.m., a hearing was held on Defendant's Motion For Partial Summary Judgment ("the Motion"). At the request of the Court, Defendant filed a supplemental brief on November 3, 2003. For the reasons stated below, the Motion is GRANTED IN PART and DENIED IN PART.

## II. *BACKGROUND*

### A. *Facts*

Plaintiff Civic Center Drive Limited Partnership ("Civic Center") owns Civic Center Apartments, located in Fremont, California. Declaration of Dan Rigney ("Rigney Decl.") at ¶ 4. Plaintiff North Ninth Street Limited Partnership ("North Ninth") owns an apartment complex called The Esplanade, in San Jose, California. *Id.* Defendant, Southwestern Bell Video Services, Inc. ("SBVS"), contracts with owners of apartment complexes and other multi-dwelling units to provide multi-channel video and audio services to residents by way of satellite transmission. Declaration of Allen Foster in Support of Defendant's Motion for Partial Summary Judgment ("Foster Decl.") at ¶ 4. To do this, SBVS installs and maintains various equip-

ment, including twin cable,[1] which typically is installed between the interior walls of the units during construction of the building. *Id.* at 5.

Plaintiffs in this action entered into contracts with SBVS for the provision of multi-channel video and audio programming services for the tenants of Civic Center Apartments and The Esplanade. *See* Pacific Bell SmartMoves Contract For Marketing Of Video Services, dated August 8, 2000 (hereinafter, "North Ninth Agreement"), Exh. 2 to Declaration of Peggy Stodola in Support of Defendant's Motion For Partial Summary Judgment ("Stodola Decl."); Multichannel Video Programming Service Agreement, dated June 12, 2001 (hereinafter, "Civic Center Agreement"), Exh. 1 to Stodola Decl.[2]

The Civic Center Agreement contains the following provisions relevant to Defendant's Motion:

**1. ACCESS**

1.1 *Grant.* [Civic Center] hereby grants to [SBVS] and [SBVS] accepts from [Civic Center] a license for the Term of this Agreement to access and use areas of the Property which ... shall be used solely to install, operate and maintain the System ... and provide the Service.

**3. INSTALLATION AND OWNERSHIP OF THE SYSTEM**

3.1 *Installation.* Operator shall install, operate, maintain, repair, replace and remove ("the Work") all facilities and equipment, passive and active, necessary for the delivery of the Service to residents of the Property ("the System") in an orderly and workmanlike fashion ... All work done in connection with the System may be done only as specified in

and only in the locations shown on the plans and specifications ("Plans") submitted by Operator and approved by Owner in owner's sole discretion.... After the initial installation of the System has been completed in accordance with the Plans, Operator may not make any material modifications to the System without the prior approval of Owner which shall not be unreasonably withheld.... Operator agrees that it shall perform all Work in a manner that preserves the aesthetics of the Property as much as possible and minimizes the effect on the appearance of the Property, including, to the extent possible, the placement of all cables and wiring underground.... All work shall be performed by Operator at times mutually agreed to by the parties. Operator shall be responsible for all maintenance and repair of the System at its sole cost through the term of the Agreement ... Owner may not modify, connect to, disconnect or remove the system or any property belonging to Operator ... Owner will not allow a third party to use the system or any property belonging to Operator....

3.2 *Title to the System.* [SBVS] shall own and have title to the System throughout the term of this Agreement.

**4. TERMINATION RIGHTS**

4.1 *Termination* (a) [Civic Center], in addition to whatever other remedies it may have at law or otherwise, may elect to terminate this Agreement and is relieved of any liabilities or obligations hereunder ... in the event of any default on the part of [SBVS]. [SBVS] shall be deemed in default hereunder upon the ... (ii) breach or default in its

---

**1.** "Twin cable" is co-axial cable coupled with a telephone line. Foster Decl. at ¶ 5.

**2.** Hereinafter, reference to "the Agreements" refer to the Civic Center Agreement and the North Ninth Agreement.

performance of any obligation hereunder ... including a breach of any covenant, representation or warranty, and failure to remedy same within a period of thirty (30) days after receipt of written notice from Owner of same; provided however, that if such default cannot reasonably be remedied within such thirty (30) day period (but is susceptible of being remedied), [SBVS] shall not be in default if it commences to remedy the default within such thirty (30) day period and thereafter diligently pursues such remedy to completion but in no event shall such completion take longer than an additional thirty (30) day period.... Neither party shall be liable to the other for any consequential, indirect or punitive damages.

5.1 *Operator Indemnity.* [SBVS] shall defend, indemnify and hold harmless Civic Center ... from and against all claims, demands, liabilities, causes of action, suits, judgments, fines, damages, and expenses ... arising from (1) the negligent installation. maintenance, upgrade, removal, use or operation of the System or the provision of the service ... or the negligent exercise of [SBVS's] other rights under this Agreement ..., (2) [SBVS's] negligence in failing to perform its obligations under this Agreement, (3) any negligent act or omission of [SBVS] ..., and (4) any breach by [SBVS] of its covenants, representations and warranties....

## 7. MISCELLANEOUS

7.8 *Governing Law.* This Agreement shall be construed and enforced in accordance with the laws of the jurisdiction where the Property is located without reference to the principles governing the conflict or choice of laws applicable in that or any other jurisdiction.

Civic Center Agreement, Exh. 1 to Stodola Decl.

The North Ninth Agreement contains the following provisions relevant to the Motion:

## III. *[SBVS] SERVICES*

### B. *Installation and Maintenance of the System*

1. During the term of this agreement, [SBVS] will own the System and ... [SBVS] will have the exclusive right to use and allow others to use the System. [North Ninth] is not authorized to permit third parties to use or connect with property owned by [SBVS], nor may [North Ninth] modify, rearrange, connect equipment to, disconnect or remover property owned by SBVS, except with prior written permission from [SBVS].

## IV. *GENERAL TERMS AND CONDITIONS*

### A. *Right of Access*

[North Ninth] grants to [SBVS] an irrevocable right of entry to the land during the term of the contract appurtenant to the land on which [SBVS]'s facilities lie ... and the right to use all facilities installed by [SBVS] in the Location during the term of this Contract hereunder....

### B. *Termination and Breach of Contract*

1. If a Party defaults on its obligations under this Agreement and fails to cure the default within fifteen (15) days after receiving written notice, in addition to all rights and remedies available at Law or in equity, the non-defaulting party may terminate the contract. If the default is not reasonably curable in the fifteen(15) day period, the Parties will negotiate

a reasonable time interval for the defaulting party to cure the default.

\* \* \* \* \* \*

3. If the Contract expires or is terminated for any reason, [SBVS] will, within forty-five (45) days after the termination date, remove all [SBVS]-owned System equipment except for all internal building and external, underground wire, cable, conduit, connectors and jacks ("Cable").... [North Ninth] will receive ownership of the cable on the termination date....

## C. Compliance with Laws, Governing Law

.... This Contract will be interpreted and governed by Laws in the state of the applicable Location.

## F. Indemnification

Each Party agrees to indemnify, defend, and hold harmless the other party ... from and against any and all liability, loss, damage, claim or expense ... incurred by the other(s) in connection with any claim, demand or suit for damages, injunction or other relief caused by or resulting from the negligence, gross negligence or intentional misconduct of the indemnifying party ....

## I. Disclaimer of Warranties and Limitation of Liability

... The Parties are not liable for each other's incidental, specific, direct, punitive or consequential damages including lost revenues or profits, or loss or damage of any kind arising out of performance or non-performance under this Contract or a System defect or failure.

North Ninth Agreement, Exh. 2 to Stodola Decl.

Pursuant to these Agreements, between November 2000 and March 2002, SBVS installed twin cable at Civic Center Apartments and The Esplanade. Answer to Amended Complaint of Plaintiffs and Counterclaim, Exh. B to Mitrakos Decl. at ¶ 14. On August 29, 2001, when most of the cable system had been installed, SBVS learned that the twin cable it had used on the two projects did not conform to Underwriters Laboratories standards. *Id.* at ¶ 15; SBVS Response to Interrogatory No. 9, Exh. A to Declaration of Kevin J. McKeon in Opposition to Defendant's Motion for Summary Judgment ("McKeon Decl.").

Seven months later, in early April 2002, SBVS informed Plaintiffs that non-conforming cable had been installed and would need to be replaced. April 2, 2002 Letter from SBVS to North Ninth and April 5, 2002 Letter from SBVS to Civic Center, Exh. 1 to Rigney Decl. During the period between August 2001 and April 2002, "construction of the Projects proceeded as mechanical, electrical, and plumbing services were installed around and simultaneously with the cable, building and fire-safety inspections were performed, and then Plaintiffs sealed these services within the walls by installing plywood sheathing ('shearwall,' ie., earthquake protection) and/or drywall." Rigney Decl. at ¶ 8.

On April 11, 2001, SBVS conducted a test to determine the magnitude of the replacement project by replacing the twin cable in a vacant unit at Civic Center Apartments. *Id.* at ¶ 12. According to Plaintiffs, because the cable was tacked down and, in some places, "routed through glue-like fire caulking," the cable could not be simply pulled out from the outlet. *Id.* at ¶ 13. Rather, a number of access holes had to be cut in the walls and ceiling to remove the cable. *Id.* at ¶ 15; *see also* Photographs of access holes, Exh. 2 to Rigney Decl. Replacement of the cable in the unit at Civic Center Apartments took

nearly 30 man-hours, not including time for repair and repainting of the walls. *Id.* at ¶ 17.

On April 19, 2002, Civic Center's President and CEO, Howard Heitner, informed SBVS that Civic Center was investigating and evaluating the impact of replacing the twin cable at Civic Center Apartments, and that pending completion of the investigation SBVS was not authorized to commence the replacement project. April 19, 2002 Letter to Allan Foster, Exh. 3 to Rigney Decl. In his letter, Heitner stated Civic Center's position as follows:

1. The corrective work you contemplate will be extremely intrusive and consume many weeks even if heavily staffed. This is due to the fact that your efforts must be coordinated carefully with ongoing finish activities of the project as well as tenant move-in dates.

2. We will be forced to perform additional work and incur significant costs after your replacement activities are concluded, such as dry wall repairs, caulking, painting, etc. This work will take place during the critical final stages of construction, which will both increase our costs and result in further delays to completion. Moreover, reinspections by the City of Fremont will be required at an additional cost of both time and money.

3. In general, we have determined that the repair work will delay occupancy of three of the four buildings on this project by one month or more, with a resulting loss of rental revenue.

4. The need to perform the repairs will necessitate extensive drywall rework on a new facility—this will adversely affect the appearance of each unit and impact negatively both the value of the property itself as well as its rental value.

We have not finally quantified the damages that will result from the above factors. It is clear, however, that the performance of this corrective work at this late stage of the project will greatly exacerbate these damages. This is particularly troublesome in light of the fact that our investigation has revealed that your organization was made aware of this situation late last year—at a time when the corrective work would have been much less intrusive and disruptive.

*Id.* Heitner went on to request that SBVS provide Civic Center with work plans and schedules for the proposed replacement work at Civic Center Apartments, as well as details of SBVS's own investigation of the problem. *Id.* Similarly, North Ninth refused to permit SBVS to replace the cable at The Esplanade and requested that SBVS provided work plans and schedules for The Esplanade. *See* May 14, 2002 Letter to Allen Foster (referencing May 9, 2002 e-mail requesting same information for the Esplanade as had been requested for Civic Center Apartments), Exh. 4 to Rigney Decl.

On May 14, 2002, Civic Center threatened to commence a legal action if SBVS did not provide the information and work schedule it had requested. *See* May 14, 2002 Letter to Allan Foster, Exh. 4 to Rigney Decl. On June 20, 2003, Civic Center filed the complaint in this action, asserting two claims: 1) breach of contract and express warranties; and 2) breach of the covenant of good faith and fair dealing. On August 16, 2002, an amended complaint was filed adding North Ninth as a plaintiff. North Ninth asserted the same two claims as Civic Center, namely, breach of contract and breach of the covenant of good faith and fair dealing. SBVS, in turn, asserted counterclaims seeking injunctive relief and a declaration that SBVS has the right to re-enter Civic Center Apartments and The Esplanade to replace the non-conforming twin cable.

On October 9, 2002, SBVS provided Plaintiffs with "Rewire Summaries" and schedules for the replacement work at Civic Center Apartments and The Esplanade. October 9, 2002 Letter from Allan Foster, Exh. 7 to Rigney Decl. Plaintiffs, however, rejected the summaries and schedule as inadequate, stating that the schedule was not a "legitimate construction schedule" and that it was evident that SBVS had given "no thought ... to the practicalities involved in implementing [the] schedule." November 8, 2002 Letter from Howard Heitner to Allan Foster, Exh. 8 to Rigney Decl.[3] Plaintiffs further informed SBVS that its failure to timely fulfill its contract obligations by delaying six months in providing the requested work schedule constituted "an absolute waiver and relinquishment of [its] rights, if any, to enter the premises and perform the corrective work." October 21, 2002 Letter from Howard Heitner to Allan Foster, Exh. 10 to Rigney Decl. Plaintiffs reiterated that they were not willing to permit SBVS to perform the requested corrective work at that time. *Id.*

In the meantime, tenants have moved into both The Esplanade and Civic Center Apartments, and SBVS is providing multichannel video and audio services to those tenants. Foster Decl. at ¶ 10. In addition, SBVS has made payments by check to Plaintiffs under the terms of the Civic Center and North Ninth Agreements. *Id.* Civic Center has never cashed the checks.

Rigney Decl. at ¶ 31. North Ninth has cashed the checks. *Id.*

### B. *The Motion*

In its Motion, Defendant asks the Court to enter summary judgment in its favor on its counterclaims for a declaration that SBVS has the right to re-enter the two apartment buildings to repair the twin cable because, under the Agreements, it is the owner of the twin cable and has the exclusive right to repair and replace the twin cable. In addition, SBVS seeks entry of summary judgment on Plaintiffs' claims to the extent that Plaintiffs seek to recover damages for diminution in value, lost rent, and costs of repair.

SBVS makes three principal arguments in its Motion. First, SBVS points to provisions in the Agreements regarding access to and ownership of the twin cable at issue. According to SBVS, these provisions make clear that SBVS has the exclusive right to replace the twin cable as a matter of law. For this reason, SBVS asserts, it is entitled to entry of judgment in its favor on its declaratory relief counterclaims *and* on Plaintiffs' claims to the extent Plaintiffs seek damages for the cost of repair. Second, SBVS cites California cases that hold that diminution of value damages are not available for breach of a construction contract. Third, SBVS points to limitation of liability provisions in the Agreements precluding consequential damages, which in-

---

3. Defendant objects to this exhibit on the basis that it is evidence of Plaintiffs' offer to accept valuable consideration in settlement of their claims and therefore, is inadmissible under Rule 408(2) of the Federal Rules of Evidence. The Court rejects Defendant's objection to this exhibit because there is no indication in either Defendant's letter accompanying the work plan and schedule or in Plaintiffs' response that the work schedule and plan constituted a settlement offer. To the contrary, Plaintiffs requested the work

schedule before this action was commenced. Similarly, the Court finds no reference to settlement negotiations in Exhibits 9 and 10 to the Rigney Decl. and therefore rejects Defendant's objections as to those exhibits. On the other hand, Exhibit 11 to the Rigney Declaration is inadmissible under Rule 408(2) because it explicitly references the parties' efforts to settle this action and is designated "For Settlement Purposes Only." Accordingly, the Court does not rely on Exhibit 11 in this Order.

clude both diminution in value and lost rent.

In their Opposition,[4] Plaintiffs assert that Defendant has no right to replace the twin cable at Civic Center Apartments and The Esplanade, regardless of the provisions in the Agreements regarding ownership and access, because Plaintiffs have either terminated or rescinded the Agreements.[5] In support of the argument that the Agreements have been terminated, Plaintiffs point to "default and cure" provisions in the Agreements, requiring that defaults be cured within a maximum of sixty days of the date on which notice of default is given (Civic Center Agreement) or within a reasonable time negotiated by the parties (North Ninth Agreement). Alternatively, Plaintiffs argue that even if the Agreements have not been terminated, SBVS's concealment of the problem constitutes actual fraud which estops SBVS from asserting any rights under the Agreements to replace the twin cable. Finally, Plaintiff argues that the provisions on which SBVS relies do not give SBVS "the right to send in an army of construction workers to invade and disrupt the lives of every tenant for twelve consecutive days, punch holes in their drywall, rip out $1 \times 4$ foot sections of drywall, and then patch, sand, texture and paint it." Opposition at 16.

With respect to the availability of lost rent and diminution in value damages, Plaintiffs argue that such damages are recoverable for several reasons. First, Plaintiffs argue that the limitation of liability clauses are no longer in effect because the Agreements have been rescinded and where an agreement has been rescinded, consequential damages are available under California Civil Code § 1692. Second, Plaintiffs assert that the limitation of liability provisions do not preclude all consequential damages because the indemnity clauses in the two Agreements allow the award of *all* damages resulting from negligent installation or any breach by SBVS of the Agreements. Third, Plaintiffs argue that the limitation of liability clauses do not apply because, when Plaintiffs agreed to the clauses, they never contemplated that SBVS would, after concealing its default for seven months, assert that it had the right to conduct such burdensome repairs.

In its Reply, SBVS rejects Plaintiffs' assertion that the Agreements have been terminated or rescinded, noting that tenants have been receiving services from SBVS and Plaintiffs have been accepting payments from SBVS pursuant to the Agreements. SBVS also disputes Plaintiffs' assertion that the Agreements have been terminated by virtue of the fact that SBVS has failed to cure the default. SBVS points out that Plaintiffs have not permitted it to replace the twin cable and, therefore, SBVS cannot be in violation of the default and cure provisions. Next, SBVS argues that it cannot be estopped from being allowed to replace the twin cable on the basis of fraudulent misrepresentations because SBVS made no *affirmative* misrepresentations to Plaintiffs regarding the installation of faulty cable. According to SBVS, it had no affirmative duty to disclose material facts to Plaintiffs

---

4. Plaintiffs' request that their Opposition brief be considered a cross-motion for summary judgment is DENIED on the basis that such a motion is untimely. In any event, even if the Court were to treat Plaintiffs' Opposition as a cross-motion for summary judgment, that motion would be denied for the reasons discussed below.

5. With respect to Plaintiffs' argument that the agreements have been rescinded, Plaintiffs note in their Opposition that they have sought leave to amend their complaint to add a claim for recision. After Plaintiffs filed their Opposition, however, the Court issued an order denying Plaintiffs' request for leave to amend.

and, therefore, its failure to reveal the installation of faulty cable does not constitute fraud. Finally, SBVS rejects Plaintiffs' arguments regarding the limitations of liability provisions as without merit.

## III. ANALYSIS

### A. Legal Standard

 Summary judgment is appropriate where no genuine dispute exists as to any issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Once the moving party has made a showing that this standard is met, the burden shifts to the party opposing summary judgment to demonstrate that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment on the meaning of the terms of a contract is appropriate where the contract terms are clear and unambiguous, even if the parties disagree as to their meaning. *United States v. King Features Entm't,* 843 F.2d 394, 398 (9th Cir.1988). Interpretation of a contract is a matter of law, including whether the contract is ambiguous. *Id.* (citing *Beck Park Apts. v. United States Dept. of Housing,* 695 F.2d 366, 369 (9th Cir.1982)).

### B. Defendant's Counterclaims

SBVS seeks summary judgment on its declaratory judgment counterclaims against Civic Center and North Ninth, asking this Court to hold, as a matter of law, that under the Agreements, SBVS has the right to re-enter the Civic Center Apartments and The Esplanade to replace the twin cable *and* that Plaintiffs may not permit any third party to work on the twin cable in these buildings.

The Court concludes that although the Agreements unambiguously give SBVS the exclusive right to replace non-conforming cable while the Agreements are in force, there are factual questions as to whether: 1) the Agreements have been terminated; or 2) SBVS is estopped from asserting these rights by virtue of its own conduct. Accordingly, the Court cannot hold as a matter of law that SBVS is entitled to re-enter the Civic Center Apartments or The Esplanade to replace the non-conforming twin cable. For the same reason, summary judgment is inappropriate with respect to Plaintiffs' request for damages for the cost of repair.

#### 1. Right to Replace under the Agreements

 The Court agrees with Defendant that the terms of the Agreements unambiguously give SBVS the exclusive right to repair during the term of the Agreements.[6] In the Civic Center Agreement, three provisions support this conclusion. First, SBVS is granted access for the term of the agreement "to install, operate and maintain the System." Civic Center Agreement, ¶ 1.1, Exh. 1 to Stodola Decl. Second, the Civic Center Agreement provides that SBVS "shall be responsible for all maintenance and repair of the System at its sole cost through the term of the Agreement." *Id.* at ¶ 3.1. Indeed, Civic Center is forbidden from modifying the System or allowing any third party to use the system. *Id.* Third, the Civic Center Agreement provides that SBVS shall "own and have title to the System" throughout the term of the Agreement. *Id.* at ¶ 3.2.

Similarly, the North Ninth Agreement unambiguously gives SBVS the exclusive right to repair during the term of the Agreement. First, the North Ninth

---

**6.** Of course, that right is not unlimited—it must be exercised in compliance with the Agreements. *See, e.g.,* Civic Center Agreement §§ 1.1 and 3.1.

Agreement provides that during the term of the Agreement, SBVS will "own the System" and "will have the exclusive right to use and allow others to use the System." North Ninth Agreement, ¶ III(B)(1), Exh. 2 to Stodola Decl. North Ninth cannot modify the installed equipment and may not allow others to use the SBVS property. *Id.* Second, the agreement gives SBVS the right to access to the Esplanade to repair the System. *Id.* at ¶ IV(A).

## 2. Termination

█ Plaintiffs, however, assert that SBVS is not entitled to summary judgment on its counterclaims because the Agreements have been terminated and, therefore, whatever rights SBVS may have had under the Agreements to replace and repair twin cable, SBVS no longer enjoys such rights. In particular, Plaintiffs point to the "default and cure provisions" in the Agreements. *See* Civic Center Agreement, ¶ 4.1, Exh. 1 to Stodola Decl. (quoted above); North Ninth Agreement, ¶ 4(B)(1), Exh. 2 to Stodola Decl. (quoted above). Under these provisions, SBVS is required to cure any default within 60 days (Civic Center Agreement) or within a "reasonable time" negotiated by the parties (North Ninth Agreement). *Id.*

SBVS does not dispute that it would have no right to re-enter the buildings if the Agreements had been properly terminated. Rather, SBVS argues that: 1) it has not breached the default and cure provisions but rather, has been thwarted in its efforts to cure by Plaintiffs' refusal to allow SBVS access to the buildings to replace the cable; and 2) Plaintiffs have not, in fact, terminated the Agreements, but instead have continued to allow SBVS to provide services to their tenants and to accept payments from SBVS. Both of these issues raise factual questions and, therefore, preclude the Court from holding as a matter of law that SBVS has the

exclusive right to replace the twin cable at issue in this case.

First, with respect to the adequacy of SBVS's efforts to cure, it is clearly envisioned in the Agreements that SBVS shall cure any default in a timely manner. *See* Civic Center Agreement, ¶ 4.1, Exh. 1 to Stodola Decl. (requiring that SBVS "diligently pursue" efforts to cure and that default be cured in no more than sixty days from date of notice); North Ninth Agreement, ¶ IV(B)(1), (providing that non-defaulting party may terminate agreement if default is not cured within fifteen days). In addition, both Agreements contain provisions that give Plaintiffs rights with respect to approval of major repairs such as the replacement of the twin cable in the two buildings. In particular, the Civic Center Agreement explicitly provides that any "material modifications" require Civic Center's prior approval, "which shall not be unreasonably withheld." Civic Center Agreement, ¶ 3.1, Exh. 1 to Stodola Decl. The North Ninth Agreement provides that where curing cannot reasonably be achieved in fifteen days, the parties "will negotiate a reasonable time interval" for curing. North Ninth Agreement, ¶ IV(B)(1), Exh. 2 to Stodola Decl.

In light of the provisions regarding SBVS's obligations with respect to cure, Plaintiffs have demonstrated the existence of a material issue of fact as to whether SBVS's efforts to cure were adequate. In particular, Plaintiffs have provided evidence that in April 2002, Plaintiffs requested that SBVS provide work plans and schedules for the replacement project and that SBVS promised to do so. Weissman Decl. at ¶ 10 (stating that Ralph Smith, of SBVS orally acknowledged need for schedule and agreed to provide); Exh. 3 to Rigney Decl. (April 19, 2002 letter to Allan Foster requesting work schedule for Civic Center Apartments). Plaintiffs have pre-

sented evidence that they repeatedly asked for these work schedules but did not receive them for six months. Exh. 6 to Rigney Decl. (July 22, 2002 Letter to Allan Foster, stating that "SBVS never delivered the work plans, schedules and other information requested by ownership to be able to determine whether to allow SVBS [sic] to re-wire the 220 units affected by its defective work"); Exh. 7 to Rigney Decl. (work schedule and cover letter provided to Plaintiffs on October 10, 2002). Plaintiffs have also presented evidence that the work schedules provided on October 10, 2002, failed to address many of Plaintiffs' concerns, especially with respect to accommodation of the needs of their tenants and protection of their property. Exh. 8 to Rigney Decl. (November 8, 2002 Letter to Allan Foster). Based on this evidence, a jury could reasonably conclude that SBVS did not meet its obligations to cure under the Agreements and, therefore, that Plaintiffs were entitled to terminate the Agreements.

Second, the Court rejects Defendant's assertion that even if Plaintiffs may have been entitled to terminate the Agreements, they did not as a matter of law actually terminate the Agreements because they have continued to accept the benefit of those Agreements. In particular, SBVS argues that because Plaintiffs have accepted payment under the Agreements and have allowed SBVS to provide services to its tenants, Plaintiffs cannot now assert that the Agreements have been terminated. SBVS does not cite any cases in support of this assertion. Plaintiffs counter that Civic Center has not accepted payments from SBVS and that North Ninth has cashed their checks only as an offset against damages (again, citing no cases). SBVS, in turn, argues that Plaintiffs have presented no admissible evidence that they either rejected payments or accepted payment under protest.

While the continued delivery of services and acceptance of at least some funds is significant evidence, the Court concludes that the question of whether Plaintiffs actually terminated the Agreements, like the question of whether SBVS breached its obligations with respect to cure, raises material issues of fact. Although SBVS does not explicitly cite to it, the doctrine on which it apparently relies is the "election of remedies" doctrine. While case law on this doctrine is scant, one case describes it as follows:

> [W]here a party with the right to terminate chooses instead to continue, the only inference to be drawn is that the party will derive a worthwhile benefit from its contractual relationship. Therefore, the party's election to continue rather than end the contract essentially moots its legal justification for termination. Once a party recognizes contractual benefits in the wake of a material breach, that particular breach can no longer be considered the antithesis of the contract, and it can no longer serve as the basis for termination. Of course, if a party chooses to continue with the contract and the other party subsequently commits another material breach, the party has the right to terminate based on the new breach.

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 392 (S.D.N.Y. 1999).

The facts of *ESPN* are instructive because they suggest that under the election of remedies doctrine, a party may give notice of termination but may continue to accept benefits under the contract until some later date, when the termination actually takes effect. In *ESPN*, the Office of Major League Baseball ("Baseball") terminated a broadcasting agreement with ESPN on the basis that ESPN had materially breached the agreement. *Id.* at 387.

The effective date of the termination was six months after notice of termination was given—that is, at the end of the baseball season for that year. *Id.* at 393. ESPN argued that Baseball had not actually terminated the agreement because it continued to accept performance for six months after notice of termination was given. *Id.* The court rejected this argument, holding that Baseball was not required to "stop the agreement mid-performance at a high costs to both parties and nonparties," but rather could terminate effective at the end of the season. *Id.* The court noted that this approach was "eminently reasonable under the circumstances," pointing to the "immeasurable" number of third parties that would have been harmed if the agreement had been terminated effective immediately. *Id.*

Here, Plaintiffs have presented evidence that they gave notice that the Agreements were terminated and that they were looking for new providers. Exh. 8 to Rigney Decl. (November 8, 2002 Letter, stating that SBVS had "waived and/or terminated its right to enter the premises and effect repairs" because of its failure to promptly reveal the installation of defective cable and its failure to "diligently pursue remedial work to eliminate the condition"). Under *ESPN,* Plaintiffs' continued acceptance of SBVS's performance while they sought to find new providers does not require the Court to conclude as a matter of law that Plaintiffs had not terminated the Agreements.

 This conclusion finds further support under California law. In California, the election of remedies need not be made until just before judgment. *Riess v. Murchison,* 503 F.2d 999 (9th Cir.1974). Prior to that point, the question of whether a party's acceptance of performance precludes the party from arguing that a contract has been terminated is one of waiver and estoppel. *Id.* Applying the four-part

test for waiver and estoppel discussed below, the Court concludes that there are material-factual questions regarding whether Plaintiffs are estopped from asserting that the Agreements have been terminated on the basis of actions that may constitute acceptance of performance by SBVS. As a result, entry of summary judgment as to termination is inappropriate.

### 3. Waiver and Estoppel

 Even if the Agreements have not been terminated, factual questions exist as to whether SBVS is estopped from asserting any right it may have had under the Agreements to replace the defective twin cable. Four elements are necessary to establish estoppel: "1) the party to be estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of the true facts; and 4) he must rely on the former's conduct to his injury." *United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th Cir.1988); *see also Platt Pacific, Inc. v. Andelson,* 6 Cal.4th 307, 319, 24 Cal.Rptr.2d 597, 862 P.2d 158 (1993) (holding that generally the question of waiver and estoppel is a question of fact).

Plaintiffs have presented evidence creating factual issues as to all four elements. First, Plaintiffs have presented evidence that SBVS was aware no later than August of 2001 that the wrong cable had been installed. Second, Plaintiffs have presented evidence that SBVS was aware that during the seven-month period between August 2001 (when SBVS learned of the problem) and April 2002 (when SBVS informed Plaintiffs of the problem), Plaintiffs were proceeding with construction of walls enclosing those cables, having good reason to believe—in the absence of any indication

to the contrary—that the installation of the twin cable had been satisfactorily completed. Third, Plaintiffs have presented evidence that they were unaware of the problem with the twin cable until April 2002. Fourth, Plaintiffs have presented evidence that the replacement of the twin cable will be vastly more expensive than it would have been if that work had been completed before the walls enclosing the twin cable were built. In light of this evidence, the Court concludes that it is a question for the jury to determine whether, by remaining silent, SBVS waived any rights it might have under the Agreements to replace the twin cable.

 The Court rejects SBVS's assertion that there can be no estoppel because SBVS made no *affirmative* misrepresentation regarding the installation of non-conforming cable. Neither of the cases on which SBVS relies address the issue here, that is, whether a party to a contract is estopped from asserting a provision in the contract by its own conduct. *See Peterson Dev. Co., Inc. v. Torrey Pines Bank*, 233 Cal.App.3d 103, 284 Cal.Rptr. 367 (1991); *A.J. Indus., Inc. v. Charles Ver Halen, Jr.*, 75 Cal.App.3d 751, 142 Cal.Rptr. 383 (1977). Nor has SBVS cited any case that stands for the proposition that a party may be barred from asserting a contract provision only where that party has made an affirmative misstatement. Indeed, it is clearly established under California law that waiver and estoppel may result from *either* a statement *or* conduct. *See, e.g., Sawyer v. Sonoma County*, 719 F.2d 1001, 1008 (9th Cir.1983) (citing *White Point Co. v. Herrington*, 268 Cal.App.2d 458, 468, 73 Cal.Rptr. 885 (1968)).

### C. *Available Damages*

SBVS asserts that as a matter of law Plaintiffs are not entitled to recover damages for diminution in value or lost rent, relying on California law governing construction contracts and the limitation of liability clauses contained in the Agreements. The Court concludes that there are issues of material fact that cannot be resolved on summary judgment regarding the enforceability of the provisions in the Agreements barring consequential damages. Thus, summary judgment is only proper if Defendants have established that there is no genuine issue of material fact as to the availability of the damages sought by Plaintiffs under California law in the absence of enforceable provisions in the Agreements limiting liability. The Court concludes that Defendants have met this burden as to diminution in value damages but not as to lost rent.

### 1. The Limitation of Liability Provisions

 SBVS argues that Plaintiffs are not entitled to lost rent or diminution in value damages because both of the Agreements contain provisions barring the award of consequential damages.[7] The Court concludes that the enforceability of these provisions turns on disputed facts and, therefore, that summary judgment on this issue is improper.

 Generally, provisions limiting liability in construction contracts are enforceable under California law so long as the parties negotiated and expressly agreed to the limitations. *See* Cal. Civ.Code

7. Plaintiffs do not dispute that lost rent and diminution in value constitute consequential damages. Moreover, the Court concludes that these damages are properly classified as such. *See Stevens Group Fund IV v. Sobrato Dev. Co.*, 1 Cal.App.4th 886, 2 Cal.Rptr.2d 460 (1991) (denying award of lost rent as conse- quential damages in action for breach of contract for sale of real property); *Askari v. R & R Land Co.*, 179 Cal.App.3d 1101, 1106, 225 Cal.Rptr. 285 (1986) (characterizing diminution in value in action involving breach of contract for sale of real property as consequential damages).

§ 2782.5.[8] However, such a provision is unenforceable if it is unconscionable or otherwise contrary to public policy. *Markborough California, Inc. v. The Superior Court of Riverside County*, 227 Cal. App.3d 705, 715, 277 Cal.Rptr. 919 (1991) (holding that limitation of liability clause in construction contract that is not unconscionable or in violation of public policy is valid so long as parties had a fair opportunity to accept, reject, or modify limitation and affirming summary judgment on basis that plaintiff had presented no evidence that it had had no such opportunity). Under § 1668 of the California Civil Code, contracts which "have for their object . . . to exempt any one from responsibility for his own fraud . . . are against the policy of the law." Cal. Civ.Code § 1668; *see also Blankenheim v. E.F. Hutton & Co.*, 217 Cal.App.3d 1463, 1471, 266 Cal.Rptr. 593 (1990) (holding that under § 1668, "a party may not contract away liability for fraudulent or intentional acts").

Plaintiffs have presented evidence which, if believed, could lead to the conclusion that their consequential damages resulted from SBVS's fraudulent concealment of the installment of faulty cable. Accordingly, a material issue of fact exists as to whether the limitation of liability provisions in the Agreements are void as against public policy.

■ Defendants assert that § 1668 cannot apply because Plaintiffs' claims sound in contract rather than tort. While there do not appear to be any cases that are directly on point, the Court is not persuaded that California courts would draw such a distinction.[9] In essence, Defendant asks this Court to hold that a limitation of liability provision may be enforced—even if it insulates a party from damages resulting from its own fraudulent acts—where a plaintiff alleges only breach of contract claims and does not assert a tort cause of action. Such a result is not required by the plain language of § 1668, which does not expressly limit the rule to tort claims. In addition, such an approach appears to contradict the Court's discussion of § 2782.5 in *Markborough*.

■ In *Markborough*, the court addressed whether or not a limitation of liability clause could be enforced in an action for breach of a construction contract. 227 Cal.App.3d at 708, 277 Cal. Rptr. 919. After examining the legislative history of § 2782.5, the court concluded that that provision was intended to reaffirm existing law, including the generally accepted rule that a limitation of liability provision will be enforced *unless* the provision is unconscionable or otherwise against public policy. *Id.* at 712, 714, 277 Cal. Rptr. 919. Although the court ultimately concluded that these exceptions did not apply, the implication of *Markborough* is that a limitation of liability provision may be unenforceable if it is in violation of public policy, *even if* the plaintiff asserts only a breach of contract claim.[10]

---

8. Section 2782.5 provides as follows:

 Nothing contained in section 2782 shall prevent a party to a construction contract and the owner or other party for whose account the construction contract is being performed from negotiating and expressly agreeing with respect to the allocation, release, liquidation, exclusion, or limitation as between the parties of any liability (a) for design defects, or (b) of the promisee to the promisor arising out of or relating to the construction contract.

 Cal. Civ.Code § 2782.5.

9. Because there appear to be no California cases that are directly on point, this Court must attempt to predict how the California Supreme Court would rule were it faced with the facts at issue here. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434 (9th Cir.1978).

10. At oral argument, Plaintiffs cited a number of cases in support of their assertion that the

## 2. California Law Governing Damages on Construction Contracts

Having concluded that factual issues remain as to the enforceability of the limitation of liability provisions in the Agreements, the Court must determine whether, even in the absence of enforceable limitation of liability provisions, Defendant is entitled to summary judgment as to Plaintiffs' request for diminution in value damages and lost rent. The Court concludes that Defendant is entitled to summary judgment as to the request for diminution in value damages but not as to lost rent.

 Section 3300 of the California Civil Code, governing contract damages, provides as follows:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused

thereby, or which, in the ordinary course of things, would be likely to result therefrom.

Cal. Civ.Code § 3300. "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 515, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) (citing Cal. Civ. Code § 3300). Whether damages arising from a breach of contract were reasonably foreseeable is a question of fact. *Sun-Maid Raisin Growers v. Victor Packing Co.*, 146 Cal.App.3d 787, 790, 194 Cal.Rptr. 612 (1983).

In the case of construction contracts, courts have struggled with the question of whether a party who suffers damages due to defective work should be awarded the

---

limitation of liability provisions in the Agreements are not enforceable. The Court has carefully reviewed these cases, as well as the cases cited by SBVS in its supplemental brief. In particular, the Court has reviewed two lines of cases. First, the Court has reviewed the cases addressing "no damages for delay" provisions in construction contracts. *See, e.g., Hawley v. Orange County Flood Control Dist.*, 211 Cal.App.2d 708, 27 Cal.Rptr. 478 (1963) (holding that whether clause in construction contract providing that no damages would be available for delay was enforceable was a factual question where there was evidence that damages resulted from unreasonable delay beyond the contemplation of the parties); *State Highway Admin. v. Greiner Eng'g Sciences, Inc.*, 83 Md.App. 621, 577 A.2d 363 (1990) (providing comprehensive overview of case-law addressing "no-damage for delay" clauses). Second, the court has reviewed the cases addressing failure of an essential remedy under the Uniform Commercial Code (U.C.C.) for breach of contracts involving the sale of goods. *See, e.g., Hartzell v. Justus Co., Inc.*, 693 F.2d 770, 773 (8th Cir.1982) (holding that where log home construction kit contained defects that could not

be repaired, contractual provision limiting damages to cost of repair failed of its essential purpose and, therefore, the limitation on liability was not enforceable); *see also Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*, 868 F.Supp. 346, 353 (D.D.C.1994) (noting in case involving sale of goods that "[m]ost jurisdictions ... hold that a seller who acted in bad faith may not claim the benefit of a limitation of remedy that by itself would be valid"). The Court concludes that neither of these lines of cases is on point. As to the no-damages for delay cases, the Court finds no authority for the proposition that the exception in those cases for uncontemplated delays should be extended to cases involving other types of liability limitation clauses. Indeed, such a result would appear to contradict the court's holding in *Markborough*, in which the court held that a limitation of liability provision did not require the defendant to have specifically advised the plaintiff of the potential risks at the time of contracting. *See* 227 Cal.App.3d at 713, 277 Cal.Rptr. 919. With respect to the failure of essential remedy cases, all of these cases appear to be based on specific provisions of the U.C.C. that are not applicable here.

cost of repair or rather, whether damages should be calculated based on the diminution in value of the structure that resulted from the defective work. *See Shell v. Schmidt*, 164 Cal.App.2d 350, 360, 330 P.2d 817 (1958) (reviewing case law addressing when cost to repair, as opposed to diminution in value, is used as a measure of damage, and holding that burden was on defendant to establish that award of cost of repair was so economically wasteful as to warrant award of diminution in value). California courts generally hold that the appropriate measure of damages for construction contracts is cost of repair. *See Kitchel v. Acree*, 216 Cal.App.2d at 123, 30 Cal.Rptr. 714 (holding that the measure of damages for breaching a building construction contract "is ordinarily such sum as is required to make the building conform to the contract"); *Jones v. Kvistad*, 19 Cal. App.3d 836, 842, 97 Cal.Rptr. 100 (1971) (same); *Glendale Fed. Savings & Loan Ass'n v. Marina View Heights Dev. Co., Inc.*, 66 Cal.App.3d 101, 123, 135 Cal.Rptr. 802 (1977) (same).

■■■■ The *Kitchel* line of cases supports the conclusion that the appropriate measure of damages on Plaintiffs' claims in this action is the cost of repair rather than diminution in value. Although *Kitchel* does not hold that diminution in value could *never* be an appropriate measure of damages, Plaintiffs have not cited any admissible evidence suggesting that the general rule articulated in *Kitchel* should not be applied here.[11]

■■■■ On the other hand, *Kitchel* and its progeny do not support SBVS's argument that under California law, *no* consequential damages, including lost rent, can be recovered on construction contracts. Neither *Kitchel* nor any other case the Court has found stands for such a broad rule. Rather, in the absence of a valid contractual limitation on liability provision, Plaintiffs are entitled to lost rent if such damages were foreseeable at the time of contracting. *See Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App.3d 442, 277 Cal.Rptr. 40 (1990); *Mahone v. Thompson*, 83 Cal.App. 561, 257 P. 127 (1927) (holding that rental value was properly included as part of damages on action for breach of building contract

11. In a letter to SBVS that is attached to the Rigney Declaration, the Senior Vice President of Civic Center Apartments, Howard Heitner, writes that "[t]he need to perform the repairs will necessitate extensive drywall rework on a new facility—this will adversely affect the appearance of each unit and impact negatively both the value of the property itself as well as its rental value." Exh. 3 to Rigney Decl. This statement raises the possibility that the cost of repair will not fully compensate Plaintiffs for Defendant's breach. Under such circumstances, a plaintiff may be entitled to both diminution in value and cost of repair. *See Thomas Haverty Co. v. Jones*, 185 Cal. 285, 197 P. 105 (1921) (in action by contractor to recover payments for construction work, affirming district court's damages award of contract price minus: 1) the cost to fix those defects that were remediable; *and* 2) the diminution in value resulting from defects that could not be remedied). The Court need not reach this issue, however, because Plaintiffs have presented no *admissible* evidence that the defects at issue here are irremediable. *See Orr v. Bank of America*, 285 F.3d 764, 773 (holding that "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment"). In particular, the letter cited above is hearsay and the Court finds that no hearsay exception applies. *See Timberlake Constr. Co., v. U.S. Fidelity and Guar. Co.*, 71 F.3d 335, 341–342 (10th Cir. 1995) (holding that letters addressing dispute that was subject of litigation and that were written in anticipation of litigation did not fall under business record exception under Rule 803(6) of the Federal Rules of Evidence and noting that "[i]t is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business."). Moreover, Plaintiffs have presented no other evidence in support of the hearsay assertions in Mr. Heitner's letter.

where contractor failed to complete building within contracted time).

In *Brandon & Tibbs*, the court explained that under California law, its is presumed that lost profits are the type of damages that are within the contemplation of the parties where the object of the contract is profit. 226 Cal.App.3d at 458, 277 Cal.Rptr. 40. Therefore, the only requirement for the recovery of lost profits is proximate causation, that is, that the lost profits are the natural and direct consequences of the breach. *Id.* The Court explained the foreseeability requirement as follows:

> The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. (5 Corbin, Contracts [1964] Damages, § 1009, p. 77.) If, because of his own education, training, and information, he had reason to foresee the probable existence of such circumstances, the judgment for compensatory damages measured by the extent of such injury will be given against him. In such a case the defendant knew or had reason to know of the surrounding circumstances and had such reason to foresee the extent of the resulting injury as would have affected the conduct of the ordinary man and would have prevented him from committing the breach of contract.

226 Cal.App.3d at 458, 277 Cal.Rptr. 40.

Here, SBVS was clearly aware that the Civic Center Apartments and The Esplanade were being built in order to rent the units in the building to tenants.

Moreover, the services of SBVS were obviously intended to attract tenants to the buildings. Thus, a jury could reasonably conclude that it was foreseeable that Defendant's installation of faulty cable—and the resulting need to perform extensive and intrusive repairs—would result in damages, in the form of lost rent, to Plaintiffs.[12] Accordingly, summary judgment on Plaintiffs' request for lost rent is improper.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion is DENIED with respect to its request for entry of summary judgment in its favor on the declaratory judgment counterclaims asserted against Plaintiffs. Defendant's Motion is also DENIED as to Defendant's request for entry of summary judgment in its favor on Plaintiffs' claims to the extent that Plaintiffs seek to recover costs of repair. Defendant's Motion is GRANTED as to Plaintiffs' request for diminution in value damages. Defendant's Motion is DENIED as to Plaintiffs' request for lost rent.

IT IS SO ORDERED.

---

**12.** The parties have not addressed what forms of lost rent may be at issue. Thus, in holding that Defendant is not entitled to summary judgment on Plaintiffs' request for lost rent, the Court does not decide whether there may be some particular forms of lost rent that may not be available to Plaintiffs.